20 F.3d 1300
 23 UCC Rep.Serv.2d 871
 William T. BRIGHT; Ed King; Dee Barwick; Lowell Lawson;
Frank Jorgensen; Bright of America, Incorporated,
a West Virginia corporation, Plaintiffs-Appellees,
v.
QSP, INCORPORATED, Defendant-Appellant.
William T. BRIGHT; Ed King; Dee Barwick; Lowell Lawson;
Frank Jorgensen; Bright of America, Incorporated,
a West Virginia corporation, Plaintiffs-Appellants,
v.
QSP, INCORPORATED, Defendant-Appellee.
 Nos. 93-1001, 93-1081.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 8, 1993.
Decided April 5, 1994.
 
 ARGUED: John Morgan Callagy, Kelley, Drye & Warren, New York City, for appellant. Gerard Ray Stowers, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, for appellees. ON BRIEF: Robert E. Crotty, Jonathan K. Cooperman, Kelley, Drye & Warren, New York City, Michael A. Brizel, The Reader's Digest Ass'n, Pleasantville, NY, Larry A. Winter, Charles L. Woody, Barbara A. Allen, Spilman, Thomas, Battle & Klostermeyer, Charleston, WV, for appellant. F.T. Graff, Jr., Benjamin L. Bailey, Elizabeth B. Elmore, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, for appellees.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case presents the question whether plaintiff-supplier may recover expenditures incurred in performing supply contracts with defendant-distributor by claiming that those expenditures unjustly enriched the defendant. Here it is clear that the expenditures benefitted the plaintiff by enhancing its own contractual performance, and that the defendant did not receive any benefits beyond the scope of its express agreements with the plaintiff. We therefore hold that the plaintiff has failed to demonstrate that the defendant-distributor received benefits it was not entitled to receive. Accordingly, we must reverse the verdict for plaintiff on the count of unjust enrichment and remand the case with directions that judgment be entered for defendant.
 
 I.
 
 2
 Both parties in this case are in the business of assisting organizations in their fund-raising activities. Defendant QSP, Inc., a wholly-owned subsidiary of Readers' Digest Association, Inc., purchases products from other companies and distributes them to youth organizations for use in fund-raising projects. Plaintiff Bright of America ("BOA") manufactures and purchases gift products, and then supplies them to QSP and other fund-raising distributors.
 
 
 3
 In August 1986, QSP and BOA entered into a written supply contract. Under the supply contract, QSP would solicit orders for BOA products, and BOA would package the products and distribute them directly to the customers. The contract provided that BOA would receive thirty percent of the retail price of each product sold. In September 1988, BOA sent a letter to QSP stating that it would also provide free prizes to QSP customers as an incentive to buy BOA products. After receiving the letter, QSP extended the 1986 supply contract through June 1990.
 
 A.
 
 4
 In November 1988, Bill Bright--BOA's founder, majority shareholder, and chairman--began looking for a partner for BOA. In the next few months, Bright met with QSP executives to discuss the possibility of what BOA now terms a "joint venture" between BOA and QSP, and what QSP calls a sale of stock. On February 10, 1989, BOA submitted a written proposal to QSP. Later in February, QSP and BOA executives held discussions on BOA's proposal, under which QSP would buy about fifty percent of BOA's stock for at least six million dollars. QSP and BOA executives met again in May 1989 at the Greenbrier Resort; this time, a price of 7.5 million dollars for eighty percent of BOA stock was discussed.
 
 
 5
 Operating under an assumption that QSP and BOA had formed a definite agreement at the Greenbrier meeting, Bright sent a letter to QSP on August 4, 1989, purporting to "memorialize" that agreement. Ten days later, QSP's president, Thomas Belli, sent a letter to BOA adamantly denying that QSP had agreed to any specific terms regarding the purchase of BOA's stock. Belli stressed that any discussions were preliminary, and that the "magnitude and complexity" of the contemplated acquisition necessitated that any agreement be approved by the legal departments of both BOA and QSP. In January 1990, after receiving information that BOA was deeply in debt, QSP decided not to enter into any agreement with BOA.
 
 B.
 
 6
 During the course of the negotiations, QSP learned that one of its other suppliers of food and gift products, Allegro, Inc., was going out of business. In February 1989, QSP executives asked BOA to fulfill Allegro's supply contract with QSP. BOA agreed to assume the Allegro contract, and began fulfilling Allegro orders by storing Allegro's food and gift inventory, distributing the products, and providing free prizes to customers as an incentive to buy Allegro products. As established by the Allegro supply contract, BOA received thirty cents per product sold.[1]
 
 
 7
 In the days following BOA's assumption of the Allegro contract, BOA undertook to improve its ability to perform that contract. For example, BOA constructed a cold storage unit to store Allegro's food products, which QSP had transferred to BOA's warehouse. BOA also upgraded its computer system in order to improve its inventory and order tracking systems. In addition, QSP hired Neil Arnold, Allegro's computer programmer, to work at BOA on data processing projects related to the 1986 supply contract and the Allegro contract. BOA reimbursed QSP for Arnold's salary and also hired Judy Denney, Arnold's former assistant at Allegro, to help Arnold. BOA contends that it assumed the Allegro contract and made the operations changes only because it believed that a joint venture agreement had been formed and that the Allegro contract was a part of that joint venture. QSP, on the other hand, maintains that the Allegro undertakings were entirely separate from the joint venture negotiations, and that BOA changed its operations on its own accord in order to improve its performance under the Allegro contract and its 1986 supply contract.
 
 C.
 
 8
 In January 1990, after QSP informed BOA of its decision not to enter into an agreement, BOA and its shareholders brought suit against QSP seeking compensatory and punitive damages based on six claims: breach of oral contract to buy eighty percent of BOA stock, promissory estoppel, fraud and misrepresentation, interference with prospective contractual relations, unjust enrichment, and conversion.
 
 
 9
 Despite its initiation of this lawsuit, BOA continued to perform its obligations under the 1986 supply contract and the Allegro contract. In June 1990, the 1986 supply contract expired. Three months later, BOA sold its assets to Russ Berrie, Inc. for approximately nine million dollars, which BOA estimated to be seven million dollars less than the value of the QSP-BOA deal.
 
 
 10
 On August 28, 1992, the district court granted QSP's motion for summary judgment on the breach of oral contract claim. 798 F.Supp. 360. At the close of BOA's case at trial, the court also granted QSP's motion for judgment as a matter of law on the interference with contractual relations and conversion claims. The remaining counts were submitted to the jury. The jury reached its conclusions only after a lengthy process necessitating the use of four different verdict sheets. The trial court rejected the first verdict because of uncertainty among the jurors as to what it represented. It rejected the second verdict because the jury awarded punitive damages against QSP without awarding any compensatory damages. On the third verdict sheet, the jury awarded BOA two million dollars in compensatory damages on the unjust enrichment claim, but failed to make any specific findings on the remaining claims. Finally, on the fourth verdict sheet, which addressed only the issues of promissory estoppel and fraud, the jury found for QSP. The court entered judgment for QSP on those two claims, but denied QSP's post-trial motion for judgment as a matter of law or for a new trial on the unjust enrichment claim.
 
 
 11
 QSP now appeals the district court's denial of its motion for judgment as a matter of law or for a new trial on the unjust enrichment claim. BOA cross-appeals the court's summary judgment ruling for QSP on the breach of oral contract claim and various other rulings regarding its promissory estoppel and fraud claims. We first address BOA's claims.
 
 II.
 
 12
 We note at the outset a general weakness in BOA's position in this case. BOA has been unable to prove any breach of contract, promissory estoppel, or fraud on the part of QSP. These theories offered BOA what was arguably a more straightforward avenue of relief than unjust enrichment, and yet BOA failed to prevail on any of them.
 
 
 13
 As to fraud and promissory estoppel, the jury found squarely against BOA. When the jury failed to make any findings on these claims on its third verdict sheet, the court submitted a special interrogatory asking the jury whether its silence indicated that it was hung on those issues or was returning a verdict for QSP on those claims. The jury answered that BOA had failed to prove the two claims. BOA now contends that the interrogatory unfairly omitted the option that the jury found for BOA on those claims, and that it effectively coerced the jury into returning a verdict for QSP. There was no reason, however, for the judge to include that option in the special interrogatory because it was clear that the jury's silence on the third verdict form did not indicate a finding in favor of BOA. The verdict form plainly indicated that a finding in favor of the plaintiff required an affirmative response, and the jury showed its understanding of this requirement by making an affirmative finding for BOA on the unjust enrichment claim. As BOA's own counsel stated during his request for an interrogatory, the confusing aspect of the jury's silence was whether it was hung or whether it believed plaintiff had failed to prove its case. The district court therefore acted within its "wide discretion," Scott v. Isbrandtsen Co., Inc., 327 F.2d 113, 119 (4th Cir.1964), when it submitted an interrogatory properly designed to resolve that confusion. See Hafner v. Brown, 983 F.2d 570, 575 (4th Cir.1992). The jury answered the interrogatory in a way that leaves no room for doubt. The record supports the jury's conclusion that the evidence demonstrated the existence of business tensions, rather than fraud or conduct on which QSP should be estopped.[2]
 
 III.
 A.
 
 14
 Faced with the adverse jury findings on its fraud and estoppel claims, BOA next challenges the district court's determination on summary judgment that no contract was formed because BOA and QSP never reached a meeting of the minds. BOA claims that the two companies reached an oral agreement on most of the major terms of a stock purchase at their Greenbrier meeting. According to BOA, this agreement is binding even though it was never reduced to a written contract. BOA further contends that QSP's failure to consummate the purchase required BOA to seek another buyer at a loss of seven million dollars to itself.
 
 
 15
 We disagree. As a threshold matter, a party attempting to establish the existence of an oral contract regarding a complex business transaction is saddled with a significant burden. The complexity of corporate transactions involving large sums gives rise to "the practical business need to have the parties' legal obligations recorded in formal documents." Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership, 734 F.Supp. 1181, 1188 (D.Md.1990); see also Skycom Corp. v. Telstar Corp., 813 F.2d 810, 816 (7th Cir.1987) (stating that in cases involving complex transactions, "the court will respect any evidence that only a formal contract binds"); Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 83 (2d Cir.1985) (holding that the complexity of a transaction dictates that the agreement be "committed to writing prior to becoming effective"). In this case, BOA and QSP were negotiating a multi-million dollar acquisition of stock. Both parties contemplated the preparation of a formal contract, which would typically be executed only upon the receipt of legal advice. In QSP's case, one would expect that approval from the Readers' Digest Board of Directors would be necessary before any agreement could take place. Therefore, the fact that the parties never produced a comprehensive written document detailing the terms of the transaction raises a presumption against the existence of a binding agreement. See Phoenix Mut., 734 F.Supp. at 1188.
 
 
 16
 Viewed against this presumption, BOA's evidence establishes only preliminary negotiations among the parties, not the existence of a binding agreement. It is basic to contract law that a meeting of the minds on the essential terms of the contract is necessary to form an enforceable agreement. See, e.g., Wheeling Downs Racing Ass'n v. West Virginia Sportservice, Inc., 157 W.Va. 93, 199 S.E.2d 308, 311 (1973); McGinnis v. Enslow, 140 W.Va. 99, 82 S.E.2d 437, 442 (1954). Here, it is undisputed that the parties never agreed on the structure of the proposed transaction; BOA itself was uncertain whether the alleged agreement contemplated an acquisition, a partnership, or a transfer of assets. BOA also concedes that the parties never set a specific closing date for the transaction. Moreover, although BOA asserts that the parties agreed to a purchase price at the Greenbrier meeting, QSP made clear through its quick response to BOA's purported memorialization of the meeting that it never assented to any specified purchase price or, for that matter, to the purchase of BOA at all. BOA also can point to no partial performance by either party indicating that the alleged agreement was actually in place. Courts faced with similar facts have held as a matter of law that no binding agreement exists. In Marmott v. Maryland Lumber Co., 807 F.2d 1180 (4th Cir.1986), this circuit held that summary judgment for the defendant was proper where (1) the parties had not reached an agreement on the structure of the transaction, and (2) the defendant terminated negotiations after being presented with a purported memorialization of an oral merger agreement. See id. at 1183-84. As in Marmott, the parties here did not reach a meeting of the minds on such basic, critical terms as the price and structure of the deal. This absence of mutual assent, coupled with the complexity of the contemplated transaction, clearly demonstrates that a rational trier of fact could not find the existence of a binding agreement between BOA and QSP.
 
 B.
 
 17
 Even if the two companies had reached a meeting of the minds sufficient to create a binding contract, the alleged agreement would still be unenforceable under the West Virginia Statute of Frauds. West Virginia law provides that "[a] contract for the sale of securities is not enforceable ... unless: (a) there is some writing signed by the party against whom enforcement is sought ... sufficient to indicate that a 1756 59 1 contract has been made...." W.VA.CODE Sec. 46-8-319 (1993).
 
 
 18
 Although BOA concedes that the alleged contract between the parties was wholly oral, it attempts to avoid application of the Statute of Frauds by contending that the agreement was not necessarily one "for the sale of securities." BOA supports this assertion with post-pleading documents and deposition testimony that characterize the agreement as one to form a limited partnership or a new corporation, rather than one for the purchase of BOA stock.
 
 
 19
 BOA's reliance on such post-pleading characterizations is misplaced. In its amended complaint, BOA described the alleged agreement as a "binding and enforceable agreement and contract for QSP to acquire 80% of BOA stock for the total price of $7,500,000.00." (emphasis added). It is well-established that "even if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions." See Missouri Hous. Dev. Comm'n v. Brice, 919 F.2d 1306, 1315 (8th Cir.1990); see also Ferguson v. Neighborhood Hous. Servs., Inc., 780 F.2d 549, 551 (6th Cir.1986). BOA's assertion in its complaint that the agreement was for a sale of stock still aptly describes what BOA contends the two parties in this case negotiated. As such, it hardly seems remiss to regard that assertion as a "judicial admission[ ]" which is "conclusively binding" on BOA. Davis v. A.G. Edwards & Sons, Inc., 823 F.2d 105, 108 (5th Cir.1987). Therefore, the alleged QSP-BOA oral agreement fell within the scope of the Statute of Frauds governing the sale of securities, and is accordingly unenforceable.
 
 IV.
 
 20
 Finally, we consider whether the jury was justified in awarding BOA two million dollars on its unjust enrichment claim. Because BOA prevailed on this claim at trial, we review the facts underlying it in a light most favorable to BOA. BOA contends that the jury properly awarded two million dollars in order to cover the costs that BOA incurred in conferring the following benefits on QSP: performing the Allegro contract for thirty cents per product rather than for thirty percent of total sales; providing free prizes for QSP customers buying BOA or Allegro products; constructing a cold storage unit to store Allegro food products; upgrading BOA's computer equipment and software; and hiring Allegro's computer programmers to assist BOA in performing the Allegro contract. We cannot agree. The above BOA services cannot constitute an unjust enrichment of QSP because (1) they were governed by preexisting express contracts, and (2) they did not confer any benefit on QSP that QSP was not entitled to receive.
 
 A.
 
 21
 It is a well-rooted principle of contract law that "[a]n express contract and an implied contract, relating to the same subject matter, can not co-exist." Case v. Shepherd, 140 W.Va. 305, 84 S.E.2d 140, 144 (1954); see also Shanks v. Wilson, 86 F.Supp. 789, 794 (S.D.W.Va.1949) (holding that no quasi-contractual recovery is possible "when the parties have clearly and plainly expressed in writing the actual contract between them"). Because an "action for unjust enrichment is quasicontractual in nature[, it] may not be brought in the face of an express contract." Acorn Structures, Inc. v. Swantz, 846 F.2d 923, 926 (4th Cir.1988). It is undisputed that BOA had a written supply contract with QSP and that BOA also agreed to fulfill the Allegro supply contract. Therefore, BOA cannot recover under an unjust enrichment theory for the services it rendered under those preexisting express contracts.
 
 
 22
 The two largest components of BOA's unjust enrichment recovery--the costs incurred in performing the Allegro contract at thirty cents per product and in providing free prizes to QSP customers--fell within the scope of the express supply contracts. First, BOA agreed to perform the Allegro contract on the price terms established by the Allegro contract, i.e., thirty cents per product. The Allegro contract provided for a lower rate of compensation than the 1986 supply contract because it did not require BOA to purchase or manufacture the products to be sold, but merely to store, handle, and distribute them. After BOA assumed the Allegro contract, it invoiced QSP for thirty cents an item and never requested an increase in its return. Having performed under an express agreement fixing its compensation, BOA cannot now seek through a claim of unjust enrichment to increase its compensation beyond the contract price. See Occidental Life Ins. Co. v. Pat Ryan & Assocs., Inc., 496 F.2d 1255, 1267 (4th Cir.1974) (refusing to award the plaintiff greater compensation than the contract price).
 
 
 23
 Second, BOA's free prizes to QSP customers were also covered by the 1986 supply contract and the Allegro agreement. On September 15, 1988, BOA sent a letter to QSP "offer[ing]" to provide a prize program at "zero cost to QSP" if QSP would extend the 1986 supply contract to June 1990. After QSP extended the contract, BOA fulfilled its new obligation by distributing free prizes to QSP customers purchasing its products. It never billed QSP for the cost of those prizes. Likewise, BOA agreed to provide free prizes to Allegro customers in connection with its contract to fulfill the Allegro orders. BOA's attempt to circumvent its express agreements and thereby receive reimbursement for those prizes must fail. Because both the thirty-cent price and the prize program were governed by the existing contracts, neither provides a basis for BOA's unjust enrichment claim.
 
 B.
 
 24
 The existence of the supply contracts underscores a further defect in BOA's unjust enrichment claim: QSP did not receive any benefits it was not entitled to receive. "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." Dunlap v. Hinkle, 173 W.Va. 423, 317 S.E.2d 508, 512 n. 2 (1984). Accordingly, a plaintiff cannot seek restitution for benefits that the defendant had a legal right to receive. See Gilpin v. American Fed'n of State, County, and Mun. Employees, AFL-CIO, 875 F.2d 1310, 1314 (7th Cir.1989) (holding that the unjust enrichment remedy requires the defendant to disgorge only those "benefits that it would be unjust for him to keep") (quoting Dobbs, Handbook on the Law of Remedies 224 (1973)).
 
 
 25
 Here, the direct beneficiary of BOA's expenditures was BOA, not QSP. BOA incurred those expenses to improve its own contractual performance and to enhance its own sales. The only benefit flowing to QSP was the receipt of BOA services that it was entitled to receive under its supply agreements, and for which it paid the contractual price. BOA's expenditure to construct a cold storage unit for Allegro products provides a perfect example. When BOA took over the Allegro inventory, it agreed to store Allegro's food products. BOA built the cold storage unit in order to fulfill that contractual obligation. BOA held the title to that unit, and ultimately sold it to Russ Berrie in late 1990. Therefore, the only benefit QSP derived from that BOA expenditure, i.e., storage of Allegro inventory, it had a right to demand under the Allegro contract.
 
 
 26
 The same result obtains with respect to BOA's hiring of former Allegro computer programmers and updating of its computer system. It was BOA, not QSP, that retained ownership of the new computer equipment and software. Moreover, the new programmers provided services to BOA so that BOA could track its inventory and thereby service its customers' orders with increased efficiency. That QSP happened to be one of those customers can hardly lead to the conclusion that QSP was unjustly enriched.
 
 
 27
 Finally, as we discussed earlier, the benefits that QSP derived from BOA's thirty-cent price for Allegro orders and from BOA's prize program were contractually-defined benefits that BOA had expressly agreed to provide. As with the other expenditures, the prize program benefitted BOA: it allowed BOA to extend its supply contract with QSP, its biggest customer, and increased BOA profits by providing an incentive for QSP customers to buy more BOA products. BOA cannot claim unjust enrichment damages for expenditures incurred primarily for its own benefit. See Overstreet v. Kentucky Central Life Ins. Co., 950 F.2d 931, 944 (4th Cir.1991). In short, because BOA's expenditures conferred only the benefits that QSP had a contractual right to receive, they cannot support BOA's unjust enrichment claim.
 
 
 28
 BOA nonetheless maintains that even if QSP's benefits fell within the scope of the Allegro contract, it still has a valid unjust enrichment claim. According to BOA, it knew that the Allegro contract would not be profitable, but agreed to fulfill the contract because of a "joint venture" agreement with QSP. Because QSP ultimately backed out of the joint venture, BOA argues, it would be unjust for QSP to retain the benefits it derived from BOA's services rendered in expectation of that venture.
 
 
 29
 BOA's argument suffers several flaws. First, BOA's claim that it assumed the Allegro contract only as part of a joint venture rings hollow. None of BOA's joint venture proposals even mentioned its assumption of the Allegro contract. Furthermore, BOA continued to fulfill the Allegro orders after August 14, 1989, the date of QSP's letter adamantly denying that the two companies had formed a joint venture of any sort. Indeed, BOA continued to incur some expenditures even after it filed suit against QSP for refusing to enter into a joint venture. BOA's own actions and proposals thus presuppose that the Allegro contract and any joint venture discussions were independent.
 
 
 30
 Furthermore, as we explained earlier, QSP and BOA never entered into any binding agreement regarding the so-called joint venture. The jury also found--and we have affirmed--that (1) QSP never made a promise to undertake a joint venture upon which BOA could justifiably rely, and (2) QSP did not make any fraudulent misrepresentations to BOA regarding a joint venture. In the absence of any agreement, promise, or fraudulent conduct by QSP rendering its receipt of BOA services unjust, we can conclude only that BOA assumed the Allegro contract at its own business risk. By failing to condition its undertaking of the Allegro contract on the existence of a joint venture, BOA took a chance that it would have to fulfill the Allegro orders regardless of the status of the joint venture negotiations. Because BOA agreed to perform the Allegro contract and QSP paid the price set by the agreement, we cannot find QSP liable for the benefits it received pursuant to that contract. We accordingly hold that the district court should have granted QSP's motion for judgment as a matter of law on the unjust enrichment claim.
 
 C.
 
 31
 When the dust is settled, this case presents nothing more than two sophisticated parties engaged in a supplier-distributor relationship governed by written contracts. Through contract, the parties have established the scope of their benefits and the limits of their liabilities, thereby injecting predictability and regularity into their relationship. BOA now asks this court to change those contractual terms and force QSP to pay more than it bargained for. To honor BOA's claim and hold that a distributor must reimburse its supplier for all the expenses incurred by the supplier in providing its services would undermine the centrality of the parties' own agreements. If BOA had desired a higher price for its services or reimbursement for its actual costs, it should have bargained for such terms and embodied them in contract.
 
 
 32
 Having failed to do so, BOA was obligated to provide the contractual services, bear the costs incurred in providing those services, and accept QSP's payment of the contract price.[3]
 
 V.
 
 33
 For the foregoing reasons, we conclude that judgment should have been entered for defendant on all of plaintiff's claims. We accordingly affirm the judgment of the district court on the issues raised in BOA's cross-appeal, and reverse the judgment in favor of BOA on the unjust enrichment claim. We remand the case to the district court with directions that judgment be entered for the defendant.
 
 
 34
 AFFIRMED IN PART; REVERSED IN PART.
 
 BUTZNER, Senior Circuit Judge, dissenting:
 
 35
 This appeal calls into question the standard for reviewing the denial of a motion for a judgment as a matter of law made after the entry of judgment on the verdict of a jury. Although the name has been changed, the standard for reviewing such a motion remains the same as the standard for reviewing the former motion for judgment notwithstanding the verdict. See Fed.R.Civ.P. 50, advisory committee's note. The proper standard has been succinctly stated:
 
 
 36
 In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.
 
 
 37
 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, Sec. 2524, at 543-45 (1971); see also Wright & Miller, supra, Sec. 2357, at 599.
 
 
 38
 The outcome of this case turned on the credibility of witnesses. Determination of credibility is a function of the jury, not the appellate court. Moreover, the standard of review, when applied to this case, requires viewing the evidence most favorably to BOA, which had prevailed before the jury, and to give it the benefit of all reasonable inferences from the evidence. The district court applied the proper standard and denied QSP's motion for judgment as a matter of law.
 
 
 39
 By way of background, Bill Bright, the principal owner of BOA, wanted to sell a controlling interest in the company or enter into a joint venture, and he had approached several prospective buyers. QSP was on the lookout for the acquisition of companies including BOA and Allegro. The principals of BOA and QSP had conferences about the prospect of QSP purchasing BOA stock or QSP and BOA forming in joint venture. On this much the parties agree, but on nearly every other aspect of the case their evidence clashes.
 
 
 40
 The parties differed most emphatically on whether they had reached an agreement about a joint venture and whether BOA made certain expenditures on behalf of the joint venture. BOA claimed it made the expenditures to further the interests of the joint venture at a significant benefit to QSP. In contrast, QSP took the position that there was no joint venture and that BOA made the expenditures to perform its obligations under the supply contracts. Counsel for the respective parties devoted almost their entire summations to the jury on these issues.
 
 
 41
 When the evidence is viewed in the light most favorable to BOA without undertaking to reassess the credibility of the witnesses, the facts emerge quite differently from the self-serving scenario that QSP presents in its appellant's brief.
 
 
 42
 In February 1989, Tom Belli of QSP phoned Frank Jorgensen and Bill Bright of BOA and told them Allegro was going out of business. Jorgensen testified that Belli said Allegro's failure put a different perspective on the joint venture and the deal needed to be done. Belli asked Jorgensen and Bright to come to QSP's office in Danbury, Connecticut. The next day Jorgensen and Bright met with Belli and QSP's vice president, Herb Horn. They agreed that Allegro's inventory for QSP should be shipped to BOA's warehouse on behalf of the joint venture. BOA agreed to pack and distribute the inventory for QSP at 30 cents per item. They agreed on behalf of the joint venture to discuss hiring Tom Evans, president of Allegro, several other Allegro officers, and Allegro's sales staff. They jointly interviewed Evans and the officers, but upon learning that the Allegro people were negotiating with a competing firm, they withdrew their offers of employment in part to avoid a bidding war with their competition and in part because Mrs. Evans did not wish to move from Atlanta. At QSP's direction, however, they did hire some of Allegro's former employees.
 
 
 43
 Subsequently, BOA made numerous expenditures. At trial, BOA thoroughly documented and extensively testified to these expenditures. The record shows that on behalf of the joint venture, in addition to hiring Allegro personnel, BOA upgraded its computer equipment and programs, relocated its data-processing keypunch operations, built a cold storage unit for the Allegro food, conducted tests to gauge the demand for QSP products, and provided prize programs for Allegro products. It would not have made those expenditures simply to distribute Allegro inventory at 30 cents per item.
 
 
 44
 Jorgensen testified that in essence the joint venture was consummated at the Danbury meeting and that QSP would control it. He also testified that Belli said, "Look, trust me, we have a deal." Jorgensen also testified that the parties agreed to meet in the summer of 1989 to work out the details of the joint venture. Tom Evans testified that he asked Belli about the deal between BOA and QSP. Belli told Evans: "It's a done deal." Sharon Beth Moore, an employee of BOA, testified that Horn of QSP told her that he was calling the shots at BOA.
 
 
 45
 In contrast to BOA's evidence, Belli testified that in his February conversation with Jorgensen and Bright he never said that the Allegro situation put another perspective on the proposed joint venture. He denied that he said at the Danbury meeting, "trust me, we have a deal," and he denied that QSP and BOA had formed a joint venture. He denied telling Tom Evans in response to Evans' question about the BOA-QSP deal that "[i]t's a done deal." Horn testified that at the Danbury meeting there was "absolutely" no discussion or agreement about a joint venture. Contradicting Ms. Moore, he claimed that there was "absolutely" no discussion or agreement about QSP taking control of BOA's operations and that he never exercised such control.
 
 
 46
 Corroborating Jorgensen's testimony, the parties met in the summer of 1989, but QSP refused to work out the details of the joint venture. After QSP repudiated the joint venture and an agreement to purchase BOA stock, BOA commenced this suit, alleging among other causes of action a claim for unjust enrichment.
 
 
 47
 The trial lasted 13 days, giving the jury ample opportunity to view the demeanor of the witnesses and assess their credibility. In view of the conflict in the testimony of the principal witnesses for each party, it is apparent that the jury did not credit QSP's evidence. The jury's verdict firmly establishes that the damages it awarded BOA arose out of the expenditures that benefitted QSP and that BOA incurred the damages on BOA's understanding that BOA and QSP had embarked on a joint venture. Contrary to QSP's contention throughout the trial, the jury found that the damages BOA incurred--including the costs of hiring Allegro personnel, upgrading operations and facilities, and providing test and prize programs--did not arise from BOA's supply agreements with QSP.
 
 
 48
 It is hornbook law that one who performs in accordance with an express contract cannot recover restitutionary damages. If in fact BOA performed all of the services pursuant to the express supply contracts, BOA could not recover as a matter of law. Restatement of Restitution Sec. 107 (1937). But if the evidence showed BOA performed the services, for which the jury awarded damages, pursuant to its belief that QSP had entered into a joint venture, quite apart from the supply contracts, BOA should not be denied relief as a matter of law. Id. Consequently, the evidence of QSP's promotion of the joint venture is material to this cause of action. The inquiry is factual. Did the evidence establish that BOA performed all services pursuant to the express supply contracts, as QSP contends? Or did the evidence establish that in addition to servicing the supply contracts BOA performed additional services, which were not contemplated by the supply contracts, as BOA contends and the jury found? The district court understood the issues when it instructed the jury and later when it denied QSP's motion for judgment as a matter of law.
 
 
 49
 The jury's verdict is consistent with the court's instructions on unjust enrichment and restitution damages. The judge instructed the jury that to prevail under their unjust enrichment claim, BOA had to prove four elements: (1) that QSP improperly utilized BOA facilities and personnel, (2) that QSP did so without compensating BOA, (3) that QSP received the benefit of an "ownership" interest in BOA, and (4) that BOA suffered damages. The judge instructed the jury that if they found unjust enrichment they should award BOA restitution damages that would restore BOA to its original position prior to the alleged wrongful interference. While these instructions are not a model for every claim of unjust enrichment, the court and the parties recognized that they were well tailored to fit the facts of this case. QSP did not object to these instructions, nor does it claim on appeal that the instructions were plain error.
 
 
 50
 The evidence discloses that QSP improperly utilized the facilities and personnel of BOA. QSP directed BOA to provide services not included in the supply contracts that caused BOA to incur costs. QSP did not compensate BOA for these services and consequently received the benefit of an "ownership" interest. The jury's verdict illustrates the notion: "[I]t is the ordinary understanding that a person who asks another to do something for him ... will pay for it unless the circumstances under which the request is made indicate otherwise." Restatement of Restitution Sec. 107 cmt. c (1937). Here the circumstances presented a factual question that the jury, in the face of conflicting evidence, resolved in favor of BOA.
 
 
 51
 Under West Virginia law, restitution damages from a claim of unjust enrichment are measured in terms of the benefit the plaintiff conferred to the defendant. Dunlap v. Hinkle, 173 W.Va. 423, 317 S.E.2d 508, 512 (1984); Somerville v. Jacobs, 153 W.Va. 613, 170 S.E.2d 805, 810 (1969). "A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit. He receives a benefit ... where he is saved expense or loss." Prudential Ins. Co. v. Couch, 180 W.Va. 210, 376 S.E.2d 104, 109 (1988) (quoting Blue Cross of Cent. New York, Inc. v. Wheeler, 93 A.D.2d 995, 461 N.Y.S.2d 624, 626 (1983)); see also Dunlap, 317 S.E.2d at 512 n. 2; Restatement of Restitution Sec. 1 cmt. b (1937).
 
 
 52
 The judge's instructions, and BOA's argument on appeal, comport with this definition of benefit. QSP benefitted to the extent that BOA saved QSP the costs it would have incurred absent BOA's expenditures. BOA would not have incurred these costs absent a perception that a joint venture existed. The jury carefully followed the court's instructions, including limiting BOA's damages to its losses. Consequently, it disallowed $193,903 of BOA's claim. The disallowance appears to have been adequate to account for any benefit BOA received from its expenditures such as the residual value of the cooling facility and software.
 
 
 53
 In its order denying QSP's motions for judgment as a matter of law, or to amend the judgement, or to grant a new trial, the district court stated:
 
 
 54
 The Court concludes that the jury's verdict was supported by substantial evidence. The Court also concludes that the verdict was neither against the clear weight of the evidence, based upon false evidence, nor a miscarriage of justice. Finally, the award to the Plaintiff did not 'exceed[ ] the maximum limit of a reasonable range within which' the jury could properly operate under the applicable law and evidence. Therefore, Defendant's motions are hereby DENIED. (citations omitted).
 
 
 55
 The district court had an opportunity to assess the weight of the evidence. Its grasp of the issues and its denial of QSP's motions are supported by the record and West Virginia law. I would affirm its judgment.
 
 
 
 [1]
 The written Allegro supply contract was not admitted into evidence at trial. However, because the terms of that contract have been discussed extensively both at trial and on appeal, we accept the trial court's findings and the parties' undisputed allegations regarding those terms
 
 
 [2]
 BOA also contends that the trial court committed reversible error by excluding as hearsay notes taken by BOA executives during their telephone conversations and meetings with QSP executives. We do not think the district court abused its discretion in excluding the evidence which was, in any event, cumulative of the trial testimony of BOA executives regarding the same meetings at which they had taken the notes
 
 
 [3]
 Our dissenting colleague points to the existence of disputed facts before the jury, but of course there are contested facts in most of the commercial disputes that come before us. The critical question is one of materiality, i.e., the place that the disputed fact occupies within the relevant legal framework
 Here, the existence of express contracts between two sophisticated business parties precludes a restitutionary recovery. Our dissenting brother fails to address the point that the benefits QSP received and the performance that BOA rendered all fit within the parties' existing contractual arrangements. See Sec. IV.A, supra. The dissenting opinion asserts repeatedly that BOA performed services which were not a part of its supply agreements with QSP. As we have discussed extensively in section IV, however, these services were used generally for the benefit of all BOA customers, were designed to maintain QSP as a customer, and were well within the scope of the performance set forth in the Allegro and QSP supply contracts. The dissent never once explains how the services constituted anything more than expenditures undertaken in the course of contractual performance. That point forms the undisputed core of this case, and the dissent has somehow embraced the untenable proposition that a party which has received no more than the benefit of its contractual bargain has been unjustly enriched.
 With respect, it is the position of our dissenting brother that cannot be reconciled with the proceedings at the trial level. The dissent's explanation that BOA assumed the Allegro contract only because of QSP's promise to buy BOA stock or to enter into a joint venture with BOA cannot be squared with the judge's and jury's conclusions that (1) QSP never agreed to buy BOA stock, (2) QSP never made any promise that BOA could justifiably rely on, and (3) QSP did not make any fraudulent misrepresentations during the course of the negotiations. The dissent has argued estoppel under an unjust enrichment label, but the jury's findings against BOA on that point foreclose this line of argument. The dissent also contends that QSP and BOA had formed a joint venture, but the district court found that no such agreement had been made, both because there was no meeting of the minds on the critical terms of the agreement and because the supposed agreement was never reduced to writing as required by the West Virginia Statute of Frauds. See Sec. III supra. The dissent has not challenged any of the various bases for the trial court's ruling. It has failed to identify exactly what the joint venture was supposed to accomplish that was beyond the scope of the parties' contractual understandings. The so-called joint venture that our dissenting brother posits is nothing more than the mutual benefit that presumably accompanies every contract between two business parties.