Michael WATERMAN, et al.

v.

Michael BATTON, et al.

No. CIV. CCB–02–1725.

United States District Court,
D. Maryland.

Dec. 11, 2003.

William J. Murphy, Murphy and Shaffer, Baltimore, MD, for Plaintiff.

Karen J. Kruger, Office of the Attorney General, Maryland Transportation Authority, J. Joseph Curran, Jr., Michael D.

Berman, State of Maryland Office of the Attorney General, Baltimore, MD, for Defendant.

Peter Saar, Baltimore Police Department, Baltimore, MD, for Movant.

### MEMORANDUM

BLAKE, District Judge.

The defendants, Michael Batton, Christopher Heisey, Kenneth Keel, and the state of Maryland, have moved for summary judgment against the plaintiffs, Michael Waterman, Roland Waterman, and Ruth Waterman. The issues in this motion have been fully briefed and no hearing is necessary. Local Rule 105.6. For the reasons stated below, the motion for summary judgment will be denied.

### BACKGROUND

On the afternoon of Tuesday, November 28, 2000, three police officers employed by the Maryland Transportation Authority ("MdTA") fired nine rounds of ammunition at an automobile occupied by Josh Waterman ("Waterman"). Waterman sustained five gunshot wounds, and died shortly thereafter as a result of his injuries. Plaintiff Michael Waterman is the brother of Josh Waterman, and the personal representative of his estate. Plaintiffs Roland and Ruth Waterman are the parents of Josh Waterman, and his sole primary beneficiaries under Maryland state law. Defendants Michael Batton, Christopher Heisey, and Kenneth Keel are the three MdTA police officers who fired the nine rounds. While the parties agree on these basic facts, they offer conflicting versions of the events leading up to and culminating in Josh Waterman's death. Because these factual disputes are critical to the resolution of the defendants' motion for summary judgment, all of the relevant factual evidence is set forth in some detail below. On this motion for summary judgment, the court must consider these facts in the light most favorable to the plaintiffs. *See Jones v. Buchanan,* 325 F.3d 520, 523 (4th Cir. 2003).

### I.

Josh Waterman was a 42–year old man with a history of bipolar disorder, a mental illness characterized by mood swings, including episodes of mania and delusional thinking. (Defs.' Mem. at Ex. 1, Lion Rep., at 1–3.) Waterman had been hospitalized on at least seven occasions since the age of 29 as a result of his bipolar disorder. (*Id.* at 1.) He had been treated with several different psychotropic medications, as well as with outpatient care. (*Id.* at 1–2.) Waterman had a history of conflicts with family members, other personal contacts, and the police, which appear to have occurred during his manic episodes.[1] (*Id.; id.* at Ex. 2, Juneau Dep., at 12–13, 15–18; *id.* at Ex. 3, Ruth Waterman Dep., at 68–69, 82.) In addition, there is evidence that Waterman had experienced delusional thinking in the past, for example believing that he had special powers. (*Id.* at Ex. 1, Lion Rep., at 2.)

In November 2000, Waterman was living in Raleigh, North Carolina with his brother, Michael Waterman, and Michael Waterman's two children, who were age 12 and 14 at the time. On Sunday, November 26 and Monday, November 27, several family members thought that Waterman might be experiencing some symptoms of mania, and on that Monday Waterman reported to a family member that he had stopped taking his prescribed medication. (Pls.' Opp. Mem. at Ex. 1, M. Waterman Dep., at 16–17; *id.* at Ex. 2, Walters Dep., at 8–10, 25–27.) On Monday evening Staci

---

1. A number of these events involved attempts by his family to have Waterman hospitalized. (Defs.' Mem. at Ex. 2, Juneau Dep., at 12, 16–18; *id.* at Ex. 3, Ruth Waterman Dep., at 82; *id.* at Ex. 4, M. Waterman Dep., at 43–44.)

Walters, Michael Waterman's ex-wife, offered to take Josh Waterman to a medical clinic the next morning, and Waterman agreed that he would go with her. (Defs.' Mem. at Ex. 5, Walters Dep., at 10–11, 13.) At some point after that conversation with Walters, Waterman apparently left Raleigh in his car and drove north on Interstate 95, ending up in the Baltimore area on the afternoon of Tuesday, November 28. (*Id.* at 13, 19–20; Pls.' Opp. Mem. at Ex. 1, M. Waterman Dep., at 17–18.) Waterman was driving a gold 1992 Mazda Protege.

Although this background may help to explain the events of November 28, it is important to note that neither of the parties have presented any evidence that any of the police officers who encountered Josh Waterman on that day were aware of his mental health history or his current mental state.[2]

2. It is the opinion of Dr. John R. Lion, M.D., a psychiatrist retained by the defendants as an expert witness, that Waterman was in a manic state on November 28, as a result of his failure to take his prescribed psychotropic medication. (Defs.' Mem. at Ex. 1, Lion Rep., at 3.) Dr. Lion states that on November 28 Waterman "was most likely delusional and believed himself to have special powers and to be invulnerable to outside social forces." (*Id.*) It is Dr. Lion's further opinion that "Waterman was in full disregard of any police officer's safety, did not intend to comply with any attempt to stop his vehicle, and represented an imminent threat to any officers who were in the path of his automobile." (*Id.*) To what extent these opinions may be admissible at trial has not been determined.

3. Farrow also testified that he witnessed Waterman fail to stop for a stop sign at a pedestrian crosswalk in the airport terminal area, almost striking several pedestrians. (Pls.' Opp. Mem. at Ex. 3, Farrow Dep., at 35–36.) However, neither of the parties has presented any evidence that this information was communicated to any of the three defendant officers prior to their encounter with Waterman.

## II.

The shooting incident in this case started with a police pursuit. On November 28 around 3:11 p.m., Josh Waterman was driving his vehicle in the terminal area of Baltimore Washington International (BWI) Airport. MdTA Officer Eric Farrow, using a radar device, recorded Waterman traveling at 51 m.p.h. in a 25 m.p.h. speed zone in the airport terminal area. (Pls.' Opp. Mem. at Ex. 3, Farrow Dep., at 22–24). Farrow got into his police vehicle, activated his emergency sirens and lights, and began to follow Waterman.[3] (*Id.* at 28.) Farrow followed Waterman onto Interstate 195 North and then onto Interstate 95 north.[4] (*Id.* at 40–41.) Shortly after Farrow and Waterman exited onto I–95 north, MdTA Officer Adam Watkowski joined in the pursuit in a second police vehicle, also with his emergency sirens and lights activated.[5] (*Id.* at 41, 81; Defs.'

4. As the two cars approached the I–95 North exit, Farrow saw Waterman throw something out of his vehicle window that looked like a white cigarette pack. (Pls.' Opp. Mem. at Ex. 3, Farrow Dep., at 80–81.) Although this information was communicated over the police radio during the pursuit (Defs.' Mem. at Ex. 11, Tr. 11/28/00 Ch. 8, at 3), neither of the parties has presented any evidence that any of the three defendant officers were aware of this information prior to their encounter with Waterman.

5. Video systems in the police vehicles driven by Officers Farrow and Watkowski recorded most of the pursuit and the events culminating in the shooting. Original VHS copies of these videos are attached to the defendants' memorandum (Defs.' Mem. at Ex. 12, Videotape: BWI 9; *id.* at Ex. 16, Videotape: BWI 6), and a DVD transfer from the VHS videotapes is attached to the plaintiffs' memorandum (Pls.' Opp. Mem. at Ex. 17; *id.* at Ex. 19). The videotapes represent independent evidence of the incident, but are subject to interpretation. In the posture of this motion for summary judgment by the defendants, all reasonable inferences from the videotape evidence will be drawn in favor of the plaintiffs.

Mem. at Ex. 12, Videotape: BWI 9; *id.* at Ex. 16, Videotape: BWI 6.) Both Farrow and Watkowski continued to follow Waterman on I–95 North, through the Fort McHenry Tunnel to the toll plaza on the other side, where the shooting occurred. (Defs.' Mem. at Ex. 12, Videotape: BWI 9; *id.* at Ex. 16, Videotape: BWI 6.)

A transcript of the police radio communications between Farrow, Watkowski, and MdTA officers at the Fort McHenry Tunnel toll plaza provides a contemporaneous record of the events leading up to the shooting. At approximately 3:16 p.m., Watkowski radioed Communications at the Tunnel that he was involved in a "10–80" (chase in progress) heading northbound on I–95 toward the Tunnel. (*Id.* at Ex. 11, Tr. 11/28/00 Chs. 1 & 6, at 1.) A communications officer at the Tunnel relayed this message to all units, identifying the subject vehicle as a gold Mazda with North Carolina license plate number MZL–1595. (*Id.* at 2.) Officers Batton, Heisey, and Keel all heard the 10–80 announcement over the police radio. (*Id.* at Ex. 19, Heisey Stmt., at 1; *id.* at Ex. 24, Keel Stmt., at 1; *id.* at Ex. 26, Batton Stmt., at 2.) MdTA officers at the toll plaza area just north of the Tunnel radioed that they had permission to get involved and were standing by. (*Id.* at Ex. 11, Tr. 11/28/00 Chs. 1 & 6, at 2.) One officer received permission to prepare "stop sticks" in the northbound lanes on the north side of the toll plaza (*id.* at 3), and someone subsequently radioed that stop sticks were being set up (*id.* at 4).[6]

At approximately 3:17 p.m., Officer Watkowski radioed to Communications at the Tunnel: "just tried to run me off the road...he's trying to take us off the road." (*Id.* at 2.) Whether or not Watkowski's description was accurate,[7] Officers Batton, Heisey, and Keel have stated that they heard this transmission over the police radio. (*Id.* at Ex. 18, Batton Dep., at 27–28; *id.* at Ex. 19, Heisey Stmt., at 3; *id.* at Ex. 20, Keel Dep., at 23.) At approximately 3:21 p.m., right after the vehicles entered the Fort McHenry Tunnel, Watkowski radioed to communications "he reached under the seat have all units 10–0." (*Id.* at Ex. 11, Tr. 11/28/00 Chs. 1 & 6, at 4.) Officer Heisey stated that he heard the 10–0 ("use caution") warning.[8] (*Id.* at Ex. 19, Heisey Stmt., at 3.)

The videotape evidence depicts the events that happened next. Waterman exited the Tunnel and proceeded to lane 12 at the toll plaza, on the far-left or western

---

*See Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994).

6. Stop sticks are deflationary devices that puncture vehicle tires in an attempt to force a vehicle to stop. Officers Batton testified that he was aware of the call for stop sticks, but he was not aware of whether the stop sticks actually were deployed. (Pls.' Opp. Mem. at Ex. 6, Batton Dep., at 20.) Officer Heisey testified that he heard the call for stop sticks and the approval given by the supervising officer. (*Id.* at Ex. 7, Heisey Dep., at 32.)

7. Officer Watkowski testified that he had pulled his vehicle in front of Waterman's vehicle, and it appeared to Watkowski that Waterman was accelerating towards the right rear side of Watkowski's vehicle. (Defs.' Mem. at Ex. 15, Watkowski Dep., at 36–37.) Officer

Farrow did not see these events. (Pls.' Opp. Mem. at Ex. 3, Farrow Dep., at 50–51.) The videotape from Farrow's unit shows that Watkowski starts to pull over from the lefthand lane to a position directly in front of Waterman's vehicle, leaving very little room between the two vehicles. (Defs.' Mem. at Ex. 12, Videotape: BWI 9.) As Watkowski changes lanes, Waterman pulls toward the right side of his lane and then abruptly moves into the right-hand lane, passes Watkowski on the right, and then moves back into the original lane in front of Watkowski's vehicle. (*Id.*)

8. However, neither of the parties has presented any evidence to suggest that any of the three defendant officers heard the transmission that Waterman had reached under his seat.

side of the twelve northbound lanes of traffic.[9] (*Id.* at Ex. 16, Videotape: BWI 6.) At this point, the police pursuit had lasted more than ten minutes.[10] (*Id.* at Ex. 12, Videotape: BWI 9.) As Waterman's vehicle emerged from the Tunnel, five uniformed MdTA officers—the three defendant officers, as well as Officer Sean Hames and Officer Lance Bellman—approached the vehicle on foot with their guns drawn. (*Id.* at Ex. 16, Videotape: BWI 6.) The videotape shows the officers emerging from the general area of a concrete island located between lanes 11 and 12, approaching from the front and right side of Waterman's vehicle. (*Id.*)

The videotape shows that the brake lights on Waterman's vehicle light up as he drives out of the tunnel and in the direction of the toll plaza, and his vehicle appears to slow down. (*Id.; see also id.* at Ex. 21, Packer Eng'g Rep.) Several of the officers testified that they saw Waterman's vehicle slow down (and perhaps stop) as he approached the toll plaza. (*Id.* at Ex. 17, Hames Dep., at 54, 59, 61; *id.* at Ex. 18, Batton Dep., at 29, 31–32; Pls.' Opp. Mem. at Ex. 5, Keel Dep., at 44.) The brake lights on Waterman's vehicle then go off, and his vehicle appears to coast for about one second. (Defs.' Mem. at Ex. 16, Videotape: BWI 6; *see also id.* at Ex. 21, Packer Eng'g Rep.) Then the brake lights go off on the car directly in front of Waterman's vehicle in the toll lane, and that car begins to move forward. (*Id.* at Ex. 16, Videotape: BWI 6.) At that moment, the back of Waterman's vehicle dips down slightly and then rises back up, and his vehicle accelerates in the general direction of the toll plaza ahead. (*Id.*) Officers Batton, Bellman, and Keel described the acceleration of Waterman's vehicle as "lunging" or "lurching" forward. (*Id.* at Ex. 18, Batton Dep., at 33; *id.* at Ex. 23, Bellman Stmt., at 2; Pls.' Opp. Mem. at Ex. 5, Keel Dep., at 48.)

Following the moment of acceleration, the videotape shows the officers aiming their weapons at the vehicle. (Defs.' Mem. at Ex. 16, Videotape: BWI 6.) Officers Batton, Hames, and Keel all testified that the first shot was fired when Waterman's vehicle started to accelerate forward.[11] (*Id.* at Ex. 20, Keel Dep., at 47–49; Pls.' Opp. Mem. at Ex. 6, Batton Dep., at 34; *id.* at Ex. 8, Hames Dep., at 68.) Batton testified that he saw the windshield on Waterman's vehicle break after he fired his first shot, and then he fired one or two

9. The toll plaza lanes are numbered 1 to 24 from east to west; lanes 1 to 12 are the northbound lanes, while lanes 13 to 24 are the southbound lanes. Lane 12 is the M–Tag lane, where vehicles can proceed through the toll plaza at a slow rate of speed without stopping to pay a toll collector.

10. The videotape from Officer Farrow's police vehicle shows that ten minutes elapsed between the time his video camera started recording the pursuit and the time that the vehicles approached the toll plaza. (Defs.' Mem. at Ex. 12, Videotape: BWI 9.) However, Farrow testified that he did not turn on the video camera in his vehicle until he exited the upper terminal of the airport, after the pursuit of Waterman already was in progress. (Pls.' Opp. Mem. at Ex. 3, Farrow Dep., at 31–32, 40.)

11. Although the plaintiffs stated in their amended complaint that the officers began to fire at the moment that Waterman's vehicle pulled forward (Am. Compl. at ¶ 14), they now point to the statement of a neutral witness, Carlos Castillo, that the officers began to fire before the vehicle accelerated (Pls.' Opp. Mem. at 22; *id.* at Ex. 20, Castillo Aff., at ¶ 3, 5). As the defendants note, the statement in the plaintiffs' complaint is a binding judicial admission, and the plaintiffs cannot now rely on witness testimony to contradict it. *See Bright v. QSP, Inc.,* 20 F.3d 1300, 1305 (4th Cir.1994) (noting that admissions in the pleadings are binding on the parties and may support summary judgment, even if they conflict with subsequent evidence).

more shots through the passenger window of the vehicle. (Defs.' Mem. at Ex. 18, Batton Dep., at 35; Defs.' Reply at Ex. 39, Batton Dep., at 37.) Heisey testified that he fired two shots, one from the front right side of the vehicle, and one from the passenger side of the vehicle.[12] (Pls.' Opp. Mem. at Ex. 7, Heisey Dep., at 48–50.) Keel testified that he fired two shots, possibly through the passenger side door of the vehicle.[13] (Id. at Ex. 5, Keel Dep., at 52.)

The officers and several other witnesses recall that, in the moments prior to the shooting, the officers were yelling at Waterman to stop. (Id. at Ex. 7, Heisey Dep., at 46–47; id. at Ex. 8, Hames Dep., at 63–64; id. at Ex. 15, Tr. 11/28/00 Ross Interview, at 2, 3, 7, 8; id. at Ex. 16, Tr. 12/5/00 Smith Interview, at 1, 3, 14; Defs.' Mem. at Ex. 18, Batton Dep., at 29, 30–31; id. at Ex. 20, Keel Dep., at 42, 46–47.) Officer Hames testified that in the moments prior to the shooting he could see Waterman's left hand on the steering wheel, and that Waterman made no sudden movements. (Defs.' Mem. at Ex. 17, Hames Dep., at 61.) Officer Keel thought that he saw both of Waterman's hands on the steering wheel. (Id. at Ex. 20, Keel Dep., at 43.) Officer Batton testified that as the officers approached the vehicle, "[Waterman] had both hands on the steering wheel...he released the steering wheel and put his hands up in like a sur-

render-type fashion."[14] (Id. at Ex. 18, Batton Dep., at 29; see also id. at 32, 67.) According to Batton, Waterman's facial expression then changed, and he gripped the steering wheel with both hands and accelerated. (Id. at 33.) The other officers reported that Waterman looked "crazed" or "zapped out," "like he didn't care" (id. at Ex. 20, Keel Dep., at 42–43), and that he was "kind of smiling" (Pls.' Opp. Mem. at Ex. 7, Heisey Dep., at 46).

Waterman's vehicle passed the officers—who were standing to the right of the vehicle and appear on the videotape to be several feet clear of it—and continued to pull forward in the toll lane.[15] (Defs.' Mem. at Ex. 16, Videotape: BWI 6.) As Waterman's vehicle proceeded past the toll booth, MdTA Officer Jeremy Birchfield deployed stop sticks at the tires on Waterman's vehicle. (Id. at Ex. 22, Birchfield Stmt., at 1; id. at Ex. 16, Videotape: BWI 6.) Officer Watkowski followed Waterman's vehicle through the toll booth area, and then drove his police vehicle in front of Waterman's vehicle, forcing Waterman to collide with him. (Id.; id. at Ex. 12, Videotape: BWI 9.) Waterman's vehicle collided with the right passenger side of Watkowski's vehicle, and came to a final stop. (Id. at Ex. 12, Videotape: BWI 9.) About two minutes later, several MdTA officers pulled Waterman from his vehicle and attempted to administer CPR. (Id.; id. at

12. Officer Keel testified that Heisey fired both of his shots from the passenger side of the vehicle. (Pls.' Opp. Mem. at Ex. 5, Keel Dep., at 50.)

13. The ballistics evidence suggests that Officer Batton fired four rounds, Officer Heisey fired two rounds, and Officer Keel fired three rounds. (Pls.' Opp. Mem. at Ex. 13, Summ. Ballistics Rep., at 2.) Keel's weapon apparently jammed after the second shot, and discharged a third round of ammunition that was not fired. (Id.; id. at Ex. 5, Keel Dep., at 52–53.)

14. Batton also stated that Waterman "relaxed" in his seat at this point. (Defs.' Mem. at Ex. 18, Batton Dep., at 67; id. at Ex. 26, Batton Stmt., at 3.)

15. Officer Keel is still running up to Waterman's vehicle when Waterman begins to accelerate forward and as the other officers appear to fire their weapons. (Defs.' Mem. at Ex. 16, Videotape: BWI 6.) As Keel runs up, he appears to step slightly into the path of Waterman's vehicle, and then immediately steps back. (Id.; see also id. at Ex. 21, Packer Eng'g Rep.)

Ex. 22, Birchfield Stmt., at 1–2.) An ambulance arrived and took Waterman to John Hopkins Bayview Medical Center, where he was pronounced dead at 4:10 p.m. (Pls.' Opp. Mem. at Ex. 14.)

The post mortem examination report of Josh Waterman indicates that he sustained five gunshot wounds: a graze wound on his front right shoulder; a shot that entered the front right side of his neck and was recovered from his left shoulder, a shot that entered and exited his front right arm; a shot that entered and exited his front right thigh; and a shot that entered and was recovered from his left thigh. (Id. at Ex. 12, Post Mortem Examination Rep., at 2–4.) The gunshot wounds to the neck and right and left thighs were front to back, while the wounds to the right shoulder and arm were back to front. (Id.) The wound to Waterman's neck was "rapidly fatal," meaning that he probably survived for only 30 seconds to two minutes after receiving the wound. (Defs.' Reply at Ex. 41, King Aff., at ¶ 6.) The ballistics report indicates that, in addition to the bullets recovered from Waterman's left shoulder and thigh, bullets were found in the back of the driver's seat, inside the driver's door, and inside the left front undercarriage of the vehicle. (Pls.' Opp. Mem. at Ex. 13, Summ. Ballistics Rep., at 3.)

### III.

The plaintiffs have identified several genuine factual disputes, which they assert are material to the various claims in this case. These factual disputes are summarized below. The materiality of these disputes will be considered in the discussion that follows.

Perhaps the most critical factual dispute is where Officers Batton, Hames, Heisey, and Keel were standing when Waterman's vehicle began to accelerate again, after slowing down as he approached the toll plaza. The officers testified that one or more of them were directly in front of Waterman's vehicle when he began to accelerate. Officer Heisey testified that he felt that Hames and himself were in the way of Waterman's vehicle, and that Keel possibly was in the way of the vehicle.[16] (Pls.' Opp. Mem. at Ex. 7, Heisey Dep., at 46.) Officer Hames testified that he stepped directly in front of Waterman's vehicle as he approached it, and that he would have been run over by Waterman if he had stayed in that position. (Id. at Ex. 8, Hames Dep., at 120; Defs.' Mem. at Ex. 17, Hames Dep., at 123.) Officer Batton testified that he saw the shape of a person move to his right and in front of Waterman's vehicle in the moments before the acceleration. (Defs.' Mem. at Ex. 18, Batton Dep., at 29–30, 32–33.)

The defendants also have presented evidence from their expert witnesses at Packer Engineering, Inc. on the location of the officers during the critical moments.[17] At the moment that Waterman's vehicle stopped coasting and started accelerating forward, Packer Engineering estimates that Officer Hames was 1' 2" within the projected path of the vehicle and 23' 2" ahead, Officer Batton was 11" outside the path and 16' 4" ahead, Officer Heisey was 2' 3" outside of the path and 38' ahead, and Officer Keel was 4' outside of the path and 72' 8" ahead. (Id. at Ex. 21, Packer Eng'g Rep.) Their estimates indicate that Officer Hames began to step out of the vehicle's

---

16. Heisey also recalls making a statement immediately afterwards to the effect: "I can't believe that he tried to run us over." (Defs.' Mem. at Ex. 31, Heisey Dep., at 121; see also id. at Ex. 22, Birchfield Stmt., at 1.)

17. Packer Engineering applied photogrammetric principles to the videotapes from the police vehicles to estimate distances and speeds. (Defs.' Mem. at Ex. 21, Packer Eng'g Rep.)

path just prior to the moment of acceleration, and that he was out of the vehicle's path within 0.6 seconds of the initial acceleration. (*Id.*)

The plaintiffs, on the other hand, have presented statements from three neutral witnesses indicating that none of the officers were standing in front of Waterman's vehicle. Kathy Lee Ross, a toll collector working in the toll booth in lane 10 [18] at the time of the shooting, stated that the officers were positioned very close to Waterman's vehicle, on the side of the vehicle but not directly in front of it. (Pls.' Opp. Mem. at Ex. 15, Tr. 11/28/00 Ross Interview, at 1, 5–7, 10.) Ross stated that it did not appear to her that any of the officers were in danger of being run over. (*Id.* at 6, 10.) Terri Smith, a toll collector working at the toll booth in lane 15 [19] at the time of the shooting, stated that none of the officers were in front of the vehicle, but rather that they were gathered around its side.[20] (*Id.* at Ex. 16, Tr. 12/5/00 Smith Interview, at 1, 5.) Carlos Castillo was driving through lane 11—the lane immediately on the right-hand side of the Water-

man vehicle—at the time of the shooting, and he states that he made eye contact with Waterman. (*Id.* at Ex. 20, Castillo Aff., at ¶ 3.) Castillo states that all of the officers approached the Waterman vehicle from the side, and that none of them stood in front of the vehicle.[21] (*Id.* at ¶ 4.)

The evidence from the videotapes is subject to interpretation, but supports the plaintiffs when viewed in the light most favorable to them. The video camera from Officer Watkowski's police vehicle was positioned directly behind and slightly to the right of Waterman's vehicle during the shooting, and thus had a clear view of the entire incident.[22] (Defs.' Mem. at Ex. 16, Videotape: BWI 6; *id.* at Ex. 21, Packer Eng'g Rep.) From the videotape, it is clear that Officers Batton, Heisey, and Keel are not directly in front of Waterman's vehicle in the moments before the shooting, and are several feet or more clear of the vehicle's right side. (*Id.* at Ex. 16, Videotape: BWI 6.) Immediately before Waterman's vehicle begins to accelerate forward, Officer Hames is positioned the furthest to the right of any of the officers. (*Id.*) From the

18. Ross, in lane 10, was separated by one toll lane from Waterman, in lane 12. Ross was interviewed by an MdTA officer at approximately 4:40 p.m. on the afternoon of the shooting. (Pls.' Opp. Mem. at Ex. 15, Tr. 11/28/00 Ross Interview.)

19. Smith, in lane 15, was separated by two toll lanes and a row of plastic orange cones from Waterman, in lane 12. Smith was interviewed by an MdTA officer on December 5, 2000, exactly one week after the shooting. (Pls.' Opp. Mem. at Ex. 16, Tr. 12/5/00 Smith Interview.)

20. Although the transcripts of the Ross and Smith interviews are unsworn witness statements, the parties have stipulated that the transcripts are genuine and authentic, and that the plaintiffs can rely upon these statement in opposition to the defendants' motion for summary judgment as if they are in the form of sworn affidavits. (Pls.' Opp. Mem. at Ex. 23.)

21. This statement is contradicted by an earlier affidavit signed by Castillo, in which he stated "I observed one or two of the officers in front of and slightly off to the right of center of [Waterman's] vehicle as it began to move forward." (Defs.' Reply at Ex. 42, Castillo Aff., at ¶ 8.) Although the conflicting statements may raise an issue of credibility, that determination is for the jury. *Cf. Vathekan v. Prince George's County*, 154 F.3d 173, 180 (4th Cir.1998) (noting that a sworn statement may not be disregarded for summary judgment purposes merely because it contradicts a prior unsworn statement; at most, this creates an issue of witness credibility for the jury to resolve).

22. The video camera from Officer Farrow's vehicle was positioned slightly to the left of and more than one full car length behind Waterman's vehicle, and thus did not have a clear view of the incident. (Defs.' Mem. at Ex. 12, Videotape: BWI 9; *id.* at Ex. 21, Packer Eng'g Rep.)

viewpoint of the video camera, a small portion of Hames' body is blocked momentarily by the passenger side mirror on Waterman's vehicle. (*Id.*) The rest of Hames' body remains in clear view throughout the incident, and is not blocked from view by any part of Waterman's vehicle. (*Id.*) Hames begins to step away to his left right before Waterman's vehicle begins to accelerate, and at the moment of acceleration his entire body is in clear view and he is moving away from the vehicle. (*Id.*) When Hames finishes taking his first step away from the vehicle, Officer Batton then appears to be closer to Waterman's vehicle than Hames. (*Id.*) A reasonable jury could view this evidence as establishing that Hames never was directly in front of Waterman's vehicle, and that he was clear of the vehicle's path at the moment of acceleration.[23]

Another dispute concerns whether Waterman aimed his vehicle toward the officers. Officer Hames testified that it appeared that Waterman steered the vehicle toward him as the vehicle accelerated. (Pls.' Opp. Mem. at Ex. 8, Hames Dep., at 148.) Officer Keel, on the other hand, stated that Waterman drove his vehicle in a fairly straight line toward the toll plaza, and did not steer his vehicle toward the officers. (*Id.* at Ex. 5, Keel Dep., at 44, 83.) Kathy Lynn Ross stated that Waterman drove in a straight course, in the line of traffic, and that it did not appear to her that he tried to run over any of the officers. (*Id.* at Ex. 15, Tr. 11/28/00 Ross Interview, at 10.) Carlos Castillo also stated that Waterman never attempted to strike any of the officers. (*Id.* at Ex. 20,

Castillo Aff., at ¶ 6.) The videotape shows Waterman's vehicle moving straight ahead, and perhaps slightly to the left away from the officers, as he accelerates past them. (Defs.' Mem. at Ex. 16, Videotape: BWI 6.)

The parties also dispute the speed of Waterman's vehicle and his rate of acceleration when he accelerated in the general direction of the officers and the toll plaza ahead. The plaintiffs stated in their amended complaint that Waterman "came to a complete stop."[24] (Am. Compl. at ¶ 12.) Several of the witnesses testified that Waterman's vehicle came to a complete stop, including two of the officers. (Pls.' Mem. at Ex. 20, Castillo Aff., at ¶ 3; Defs.' Mem. at Ex. 17, Hames Dep., at 61; *id.* at Ex. 18, Batton Dep., at 31–32.) Other witnesses indicated that Waterman never stopped (Pls.' Opp. Mem. at Ex. 15, 11/28/00 Ross Interview, at 7; Defs.' Mem. at Ex. 19, Heisey Stmt., at 3; *id.* at Ex. 20, Keel Dep., at 44, 47; *id.* at Ex. 23, Bellman Stmt., at 2), and that he was traveling at a slow speed throughout the encounter (Pls.' Opp. Mem. at Ex. 15, 11/28/00 Ross Interview, at 3, 4). Several of the officers have testified that Waterman's vehicle appeared to be moving at a fast speed when he accelerated. (*Id.* at Ex. 5, Keel Dep., at 48; Defs.' Mem. at Ex. 17, Hames Dep., at 66.) Although the defendants now appear to have adopted the plaintiffs' position that Waterman's vehicle came to a complete stop before accelerating (Defs.' Reply at 2), their own expert witnesses at Packer Engineering have stated that Waterman's vehicle was traveling at approximately 11.1

---

**23.** It is important to note that the video camera on Officer Watkowski's police vehicle was filming from the right of Waterman's vehicle rather than from straight behind, and thus may slightly distort the positions of the officers relative to Waterman's vehicle. Nonetheless, the court must make all reasonable inferences in favor of the plaintiffs on this motion for summary judgment.

**24.** The plaintiffs now appear to accept the findings of the defendants' experts that Waterman slowed to a speed of 11.1 m.p.h., and then accelerated to a speed of 14.8 m.p.h. (Pls.' Mem. at 6–7, 19.)

720

m.p.h. in the moments prior to acceleration, and then accelerated to 14.8 m.p.h.[25] (Defs.' Mem. at Ex. 21, Packer Eng'g Rep.) Another factual dispute centers on when the three defendant officers fired the nine shots. The plaintiffs argue that the shots were fired in two separate "volleys"—one volley of two or three shots "when the officers first approached the passenger side" of the vehicle, and a second volley of five to six shots "as they ran behind [the vehicle] and alongside it."[26] (Pls.' Opp. Mem. at 7–8.) Kathy Lee Ross stated that she heard two rounds of shots—the majority of shots were fired while Waterman's vehicle was slightly in front of the toll plaza, while several additional shots were fired as the vehicle passed underneath the toll plaza.[27] (Id. at Ex. 15, Tr. 11/28/00 Ross Interview, at 2, 5, 6, 10.) In addition, the videotape shows at least one officer running up from behind, aiming, and apparently firing his gun from the side of Waterman's vehicle right before it passes underneath the toll plaza, approximately six seconds after the vehicle had accelerated forward.[28] (Defs.' Mem. at Ex. 16, Videotape: BWI 6.) At this moment, Waterman's vehicle appears to have come to a complete stop right behind the vehicle in front of him in the toll lane, and the three other officers are behind and completely clear of the vehicle. (Id.)

Related to this question, there is conflicting evidence on where the officers were standing when they fired the shots. There is strong evidence to suggest that at least some of the shots were fired from the front of the vehicle.[29] Other evidence suggests that at least some of the shots were fired from behind the vehicle. Carlos Castillo stated that the officers continued to fire their weapons as the Waterman vehicle moved forward, "through the side and

25. The defendants continue to rely on the Packer Engineering finding that Waterman accelerated up to a speed of 14.8 m.p.h. (Defs.' Reply at 2, 5, 6), but they contradict this very analysis when they state that Waterman's vehicle came to a complete stop and then accelerated from a speed of 0 m.p.h.

26. The defendants argue that this "two volley" theory is precluded by the plaintiffs' statement in their amended complaint that "the three defendant officers simultaneously began to fire" (Am. Compl. at ¶ 14), which constitutes a binding admission. See Bright, 20 F.3d at 1305. The plaintiffs in fact incorporate both of these factual arguments into their complaint and their memorandum, arguing that the officers began firing as soon as Waterman's vehicle accelerated, and then followed the vehicle and continued to fire. (Am. Compl. at ¶ 15; Pls.' Opp. Mem. at 20.) These statements of fact are not clearly contradictory, and the plaintiffs will not be precluded from making this argument.

27. In a subsequent affidavit, Ross confirmed that she did not hear any shots fired until Waterman's vehicle was in the general area directly in front of the toll booth. (Defs.' Reply at Ex. 43, Ross Aff., at ¶ 7–9, Ex. 1, 4.)

28. The videotape shows the hand of the officer with his gun aiming at Waterman's vehicle, and then twice what appears to be the recoil of the gun as a shot is fired. (Defs.' Mem. at Ex. 16, Videotape: BWI 6.) The videotape also shows another officer running after and apparently aiming his gun at the vehicle as it passes underneath the toll plaza. (Id.)

29. Joseph Kopera, an employee in the state police ballistics laboratory who has examined the ballistics evidence, opines that the bullet that struck the front windshield was fired from the front or within 30 degrees of the front of the vehicle. (Defs.' Mem. at Ex. 28, Kopera, at 3.) Another bullet penetrated the left front grill of Waterman's vehicle (Pls.' Opp. Mem. at Ex. 13, Summ. Ballistics Rep., at 10), and a hole in the left front tire may have been caused by another bullet (id. at 7, 9). Kopera opines that a bullet could not have penetrated the car side-to-side and made the hole in the left front tire (Defs.' Mem. at Ex. 28, Kopera, at 3), suggesting that this bullet also must have been fired from the front of the vehicle.

back windows as they ran behind and beside the vehicle." (Pls.' Opp. Mem. at Ex. 20, Castillo Aff., at ¶ 5.) The post mortem examination of Waterman found that two of his five gunshot wounds were back to front, suggesting that shots may have been fired from behind him. (*Id.* at Ex. 12, Post Mortem Examination Rep., at 2–4.) In addition, the ballistics report states that one bullet was found in the back of the driver's seat, and Kopera opines that this bullet entered the vehicle through the right rear pillar. (*Id.* at Ex. 13, Summ. Ballistics Rep., at 4; Defs.' Mem. at Ex. 28, Kopera, at 3.)

Finally, both parties have proposed well-qualified expert witnesses on police use of force, who have reached contrary conclusions on whether the officers' actions were consistent with standard police practices and were objectively reasonable. Charles J. Key, Sr., retained by the plaintiffs, concludes that "the actions of the officers in this case were not objectively reasonable and not consistent with standard police practices, policy, and training." (Defs.' Mem. at Ex. 29, Key Aff., at ¶ 10). Samuel M. Wichner, retained by the defendants, concludes that "the Maryland Transportation Authority officers acted appropriately in all areas involving this incident." (*Id.* at

Ex. 27, Wichner Rep., at 13.) The two experts would offer conflicting opinions regarding whether the use of deadly force was warranted, based on the facts known and observable to the defendant officers. (*Id.* at Ex. 29, Key Aff., at ¶ 13–16; *id.* at Ex. 27, Wichner Rep., at 9–13.) This conflicting expert witness testimony proffered by the two parties supports the conclusion that genuine factual disputes exist, precluding the entry of summary judgment.[30]

## ANALYSIS

The plaintiffs filed this suit in the Circuit Court for Baltimore City on April 10, 2002, and the defendants removed the action to federal court on May 17. The plaintiffs allege that the defendants' conduct on November 28, 2000 violated Josh Waterman's state and federal constitutional rights, and constituted battery, gross negligence, and wrongful death under Maryland law. Counts one through five of the complaint are brought by Michael Waterman, in his capacity as the personal representative of Josh Waterman's estate. *See* Md.Code Ann., Est. & Trusts § 7–401(y) (authorizing the personal representative of an estate to bring a personal action that the decedent might have

---

**30.** The defendants have filed a motion *in limine* to preclude Key's testimony, directed both to evidence at trial and to evidence presented in the plaintiffs' memorandum in opposition to the defendants' motion for summary judgment. Although there are certain aspects of Key's proposed testimony that might be excluded at trial, his testimony generally is admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and relevant Fourth Circuit precedent. The Fourth Circuit has held that expert witness testimony on police use of force may be admissible in cases alleging excessive force, including expert testimony on the ultimate issue of whether a particular use of force was objectively

reasonable under the circumstances. *See United States v. Mohr,* 318 F.3d 613, 622–25 (4th Cir.2003); *Kopf v. Skyrm,* 993 F.2d 374, 377–79 (4th Cir.1993). Ultimately, the trial court must determine whether the proffered expert testimony is valid and reliable, and whether it will assist the trier of fact. *See United States v. Barnette,* 211 F.3d 803, 815 (4th Cir.2000). The plaintiffs have introduced ample evidence establishing Key's experience and general methodology, and the defendants have failed to raise any serious doubts regarding the overall validity, reliability, or relevance of Key's testimony. Nonetheless, the motion to preclude will be denied without prejudice, so that the defendants may raise any remaining specific objections to Key's testimony at trial.

brought). Counts six and seven are brought by Roland and Ruth Waterman, in their capacity as the sole primary beneficiaries of Josh Waterman under Maryland law. *See* Md.Code Ann., Cts. & Jud. Proc. § 3–904 (providing that a surviving spouse, child, and / or parent are the primary beneficiaries in a wrongful death action). The plaintiffs seek compensatory and punitive damages under counts one through four and six, and they seek compensatory damages only under counts five and seven.[31]

Count one alleges that the three defendant officers violated Josh Waterman's state constitutional rights under Articles 24 and 26 of the Maryland Declaration of Rights.[32] Count two, brought pursuant to 42 U.S.C. § 1983,[33] alleges that the three defendant officers violated Josh Waterman's federal constitutional rights under the Fourth, Fifth, and Fourteenth Amendments. The third count alleges that the three defendant officers committed a battery against Josh Waterman, and the fourth count alleges gross negligence by the three defendant officers. Count five is brought against the State of Maryland pursuant to the Maryland Tort Claims Act ("MTCA"), Md.Code Ann., State Gov't § 12–101, *et seq.,* and seeks to recover damages from the state based on the alleged negligence of the three defendant officers as employees of the state. Count six is a wrongful death action brought against the individual defendant officers, while count seven is a wrongful death action brought against the State of Maryland pursuant to the MTCA, based on the alleged negligence of the three defendant officers as employees of the state.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific

---

**31.** The plaintiffs also seek attorney's fees pursuant to 42 U.S.C. § 1988 under count two.

**32.** The Maryland state courts recognize a common law actions for damages when an individual is deprived of his liberty in violation of the Declaration of Rights. *See, e.g., Okwa v. Harper,* 360 Md. 161, 757 A.2d 118, 140 (2000) (recognizing a common law action for damages for an alleged violation of Article 24 in an excessive force case); *Ford v. Baltimore City Sheriff's Office,* 149 Md.App. 107, 814 A.2d 127, 143 (2002) (same for an excessive force claim under Article 26).

**33.** That section provides in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## I. Evidentiary Issues

■ The plaintiffs object to a number of the exhibits attached to the defendants' memorandum. As to Exhibit 10 (Md. Transp. Auth. Police Dep't Suppl. Rep., 12/11/00); Exhibit 14 (Md. Transp. Auth. Police Dep't Suppl. Rep., 11/29/00), Exhibit 22 (Md. Transp. Auth. Police Dep't Suppl. Rep., 12/5/00), Exhibit 23 (Md. Transp. Auth. Police Dep't Use of Force Rep., 11/29/00), and Exhibit 30 (Md. Transp. Auth. Police Collision Reconstruction Rep., 8/11/00), the plaintiffs argue that these constitute unsworn witness statements, which would be inadmissible at trial. (Pls.' Mem. at 12.) The plaintiffs do not challenge the authenticity of these documents (*id.* at 12 n. 7), and the defendants have produced an affidavit from the custodian of records for the MdTA Police certifying that these documents are true and accurate copies of the public business records of the MdTA Police (Defs.' Reply at Ex. 49, McLhinney Aff.). These documents are admissible as public records

under Fed.R.Evid. 803(8), and may be considered in support of the defendants' motion for summary judgment.[34]

The plaintiffs also object to Exhibits 9 and 10 to the defendants' memorandum, a DVD and hard-copy version of a Powerpoint© computer presentation summarizing the evidence presented in the defendants' memorandum. The court agrees with the defendants that the plaintiffs cannot now object to the use of this presentation based on the defendants' refusal to produce this document during discovery, because the plaintiffs did not file a motion to compel or otherwise pursue this objection before the close of discovery. The plaintiffs also argue that the presentation constitutes legal argument rather than evidentiary material. (Pls.' Opp. Mem. at 12–14.) The presentation consists almost entirely of factual evidence, however, and essentially recreates the events that took place on November 28 from the perspective of the defendants, based on documents that have been attached to the defendants' memorandum as paper exhibits. The Fourth Circuit has stated that videotape evidence purporting to recreate the events at issue in a case—including computer-animated simulations—may be admissible if the events depicted are substantially similar to the actual events, at least to the extent that the facts are undisputed, or if the jury is instructed that the videotape depicts only one party's version of events. *See Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 424–25 (4th Cir.1996); *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1051–52 (4th Cir.1984). Although

**34.** The plaintiffs also object to Exhibit 6 to the defendants' memorandum, a report from the Raleigh, North Carolina police department dated November 28, 2000, which documents damage that Josh Waterman apparently caused to Michael Waterman's home before he left Raleigh. (Defs. Mem at Ex. 6.) The court does not consider the information contained in this report to be necessary or relevant to resolving the issues presented in the defendants' motion for summary judgment. To the extent that the issue is relevant, Josh Waterman's mental state on November 28 has been established through deposition testimony.

specific issues of relevance and potential prejudice may be raised at trial, at this point the defendants will be allowed to rely on the presentation in support of their motion for summary judgment.[35]

## II. Section 1983 Claim

The plaintiffs allege that the use of deadly force against Josh Waterman violated his federal constitutional rights, and they seek monetary damages from the three defendant officers. The defendants argue that the officers did not violate Waterman's constitutional rights, and that the officers are protected from liability by the doctrine of qualified immunity. Government officials performing discretionary functions are entitled to immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When evaluating a claim of qualified immunity, the court first must consider the threshold question of whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the plaintiff has stated a constitutional violation, then the court must consider whether the right was "clearly established" at the time of the violation. *See id.*[36] This second step in the qualified immunity analysis asks "whether it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See id.* at 202, 121 S.Ct. 2151. Thus, in order to survive the defendants' motion for summary judgment, the plaintiffs must state the violation of a constitutional right, and that right must have been clearly established at the time that Josh Waterman suffered his injuries, on November 28, 2000. *See Jones,* 325 F.3d at 527.

### A. Constitutional Violation

The Fourth Amendment protects citizens from "unreasonable seizures," and thus prohibits the use of excessive force by police officers to seize a free citizen. *See Jones,* 325 F.3d at 527; *see also Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). All claims alleging that a police officer used excessive force to effect a seizure are analyzed under the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).[37] The test is one of "objective reasonableness under the circumstances." *Id.* at 399, 109 S.Ct. 1865 (internal quotations omitted). The individual officers' subjective motives or intent are irrelevant. *See Jones,* 325 F.3d at 527. The court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Graham,* 490 U.S. at 396, 109

---

**35.** The court makes no judgment about the admissibility of the Powerpoint© presentation at trial.

**36.** The defendants suggest that in excessive force cases the objective reasonableness test under the Fourth Amendment and the qualified immunity analysis may merge into a single test. (Defs.' Mem. at 10–11.) The Supreme Court rejected this argument in *Saucier. See* 533 U.S. at 204, 121 S.Ct.

2151 ("The inquiries for qualified immunity and excessive force remain distinct.").

**37.** Although the plaintiffs cite the Fourth, Fifth, and Fourteenth Amendments as grounds for their § 1983 count, the claim is one of excessive force and thus must be analyzed under the Fourth Amendment objective reasonableness standard. *See Gray Hopkins v. Prince George's County, Md.,* 309 F.3d 224, 231 n. 1 (4th Cir.2002).

S.Ct. 1865). This inquiry "requires careful attention to the facts and circumstances of each particular case." *Id.* (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865). Ultimately, the question is whether the particular use of force was justified under the totality of the circumstances. *See Garner,* 471 U.S. at 8–9, 105 S.Ct. 1694; *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994) ("The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances.").[38]

Specifically, the court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Jones,* 325 F.3d at 527 (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865) (internal quotations omitted). Another relevant factor is the "extent of the plaintiff's injury." *Id.* In weighing these factors, the court must "consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the 20/20 vision of hindsight, recognizing that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* (quoting *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865) (internal quotations omitted). The critical question is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.*

(quoting *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.1996)).

When an officer uses deadly force to effect a seizure, "the intrusion on Fourth Amendment rights is 'unmatched.'" *Clem v. Corbeau,* 284 F.3d 543, 550 (4th Cir. 2002) (quoting *Garner,* 471 U.S. at 9, 105 S.Ct. 1694). The use of deadly force is reasonable only "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner,* 471 U.S. at 11, 105 S.Ct. 1694; *see also Gray Hopkins v. Prince George's County, Md.,* 309 F.3d 224, 231 (4th Cir.2002) ("Deadly force, however, is justified only where a reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others.") (internal quotations omitted).

In evaluating the use of force in this case, the inquiry must focus on the facts known to the three defendant officers at the time of the shooting, rather than all objective facts in the record. The evidence in the record "must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland,* 41 F.3d at 173. This "limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived." *Id; see also Gooden v. Howard County, Md.,* 954 F.2d 960, 965 (4th Cir.1992) ("What matters is whether the officers acted reasonably upon the re-

---

**38.** The plaintiffs and their expert witness, Charles J. Key, Sr., suggest that the officers' actions in firing at Waterman in a crowded toll plaza endangered bystanders. (*See* Pls.' Mem. at 7–8, 22; Defs.' Mem. at Ex. 29, Key Aff., at ¶ 14, 16.) The Fourth Circuit has indicated that "the risk posed to third parties by the official use of force is not to be considered in determining whether that use of force

was excessive as against a particular section 1983 plaintiff." *Howerton v. Fletcher,* 213 F.3d 171, 175 (4th Cir.2000). In assessing the excessive force claim under § 1983, this court will not consider any evidence of the risk posed to bystanders at the toll plaza by the officers' use of deadly force against Waterman.

ports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced.") For this reason, the objective reasonableness of the three defendant officers' actions cannot be evaluated based on facts that were not known to them, although known to others—including Waterman's mental health history, his mental state at the time of the shooting, and various actions he took during the pursuit that were not communicated to the three defendant officers.[39]

The suspected criminal activity of which the three defendant officers were aware, the first factor under *Graham*, arguably was serious. Officers Farrow and Watkowski had reported that Waterman had failed to stop his vehicle in response to two police vehicles with their emergency lights and sirens activated, and the defendant officers could witness this personally at the toll plaza. A driver's failure to respond to a police signal to stop, including emergency lights and signals, is a misdemeanor under Maryland law. *See* Md.Code Ann., Transp. § 21–904(b). Officer Watkowski's radio broadcast of "just tried to run me off the road...he's trying to take us off the road" (Defs.' Mem. at Ex. 11, Tr. 11/28/00 Chs. 1 & 6, at 2) suggests that Waterman was engaging in reckless or negligent driving, *see* Md.Code Ann., Transp. § 21–901.1, or assault in the second degree, *see* Md.Code Ann., Crim. Law § 3–203, both misdemeanors under Maryland law, or possibly assault in the first degree, *see id.*

§ 3–202(a)(1), a felony under Maryland law.[40] On the other hand, there was no evidence that Waterman had committed a felony independent of the pursuit, such as robbery, burglary, or unlawful use of a weapon. As to the third factor under *Graham*, Waterman's failure to stop weighs in favor of the defendants, because Waterman was "actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. 1865. Weighing in favor of the plaintiffs, however, is the severity of Waterman's injuries, the fourth factor recognized by the Fourth Circuit. *See Jones,* 325 F.3d at 527.

Ultimately, the use of force in this case must be based on the second *Graham* factor, "an immediate threat to the safety of the officers or others." 490 U.S. at 396, 109 S.Ct. 1865. Because the officers used deadly force, the threat must be not only immediate, but also one of "serious physical harm," based on "probable cause" or "sound reason." *See Garner,* 471 U.S. at 11, 105 S.Ct. 1694; *Gray–Hopkins,* 309 F.3d at 231. The defendants rely on the threat to the officers from Waterman's vehicle possibly striking them as Waterman accelerated forward. (Defs.' Mem. at 11–13, 17.) The defendants also note the potential threat posed by Waterman to third parties, such as toll collectors, drivers in other vehicles at the toll plaza, and other MdTA officers who were not in the immediate vicinity of Waterman's vehicle when he accelerated forward. (*Id.* at 15–16, 23–24.) For example, Waterman might have jumped out of his vehicle and run,

**39.** This includes evidence cited by the defendants in their memorandum that Waterman failed to stop for a crosswalk at the airport and nearly struck two pedestrians, tossed what appeared to be a cigarette package out of his vehicle's window during the pursuit, and reached under his seat (Defs.' Mem. at 16, 23), and evidence cited by the plaintiffs that Waterman was driving within the speed limit (Pls.' Opp. Mem. at 3, 5). There is no evidence that any of these facts were known

to the three defendant officers at the time of the shooting, and thus they are not relevant to evaluating the objective reasonableness of the officers' actions.

**40.** Assault in the first degree would require an intentional attempt to cause serious physical injury, defined as creating a substantial risk of death. *See* Md.Code. Ann., Crim. Law §§ 3–202(a)(1), 3–201(c).

possibly attempting to take a hostage or carjack another vehicle, or Waterman might have hit other vehicles or persons with his vehicle. (*Id.* at Ex. 18, Batton Dep., at 25–26; *id.* at Ex. 20, Keel Dep., at 23–24.)

■ As to whether Waterman posed an immediate threat of serious physical harm to the officers, the key question of material fact in this case is whether any of the officers were in a position to be in reasonable apprehension of serious physical injury. *See Drewitt v. Pratt,* 999 F.2d 774, 776, 780 (4th Cir.1993) (stating that an officer had probable cause to believe that the use of deadly force was necessary to prevent his own serious injury or death, where the officer was in front of the vehicle when the suspect accelerated toward him and struck him, and the officer fired his gun while on the hood of the vehicle); *Dorsey v. Ruth,* 222 F.Supp.2d 753, 754, 756 (D.Md.2002) (stating that a reasonable officer could have believed that the suspect posed a threat of serious physical harm, where an officer was standing approximately 10 to 15 feet behind the suspect's vehicle when the suspect floored the vehicle in reverse).[41] In *Drewitt,* the Fourth Circuit specifically noted that the district court was incorrect to suggest that the

officer's position relative to the vehicle at the moment of acceleration was not relevant to the question of whether the officer had probable cause of an immediate threat of serious physical harm to himself. *See* 999 F.2d at 778, 780. As stated above, there are genuine disputes in this case as to where the officers were standing relative to Waterman's vehicle at the moment of acceleration. Three neutral witnesses have stated that none of the officers were standing in front of Waterman's vehicle, and a reasonable juror could view the videotape evidence as supporting these witnesses. (*See* Pls.' Opp. Mem. at Ex. 15, Tr. 11/28/00 Ross Interview, at 5–7, 10; *id.* at Ex. 16, Tr. 12/5/00 Smith Interview, at 5; *id.* at Ex. 20, Castillo Aff., at ¶ 4; Defs.' Mem. at Ex. 16, Videotape: BWI 6.) This is not a case where witnesses viewed the event from a worse vantage point than the officers, and then raised only "minor discrepancies in testimony." *Anderson v. Russell,* 247 F.3d 125, 131 (4th Cir.2001) (stating that contrary witness statements regarding the positioning and speed at which a suspect reasonably believed to be armed was raising his hands when an officer fired shots at him were not sufficient to raise a genuine dispute); *see also Sigman v. Town of Chapel Hill,* 161 F.3d 782,

---

41. Decisions from other courts of appeals involving the use of deadly force against a suspect in a moving vehicle, where the use of force was based on a threat to the officer, also have pointed to the officer's position relative to the vehicle. *See, e.g., Hernandez v. Jarman,* 340 F.3d 617, 620–21, 623–24 (8th Cir.2003) (stating that a reasonable officer would fear an immediate threat of serious physical harm, where a suspect engaged in a 45–mile police pursuit at speeds up to 100 m.p.h., evaded several roadblocks, struck a police vehicle during the pursuit, ran head-on into another police vehicle, and then turned his vehicle in the officer's direction); *Abraham v. Raso,* 183 F.3d 279, 293–94 (3d Cir.1999) (holding that an officer was not entitled to summary judgment on her use of deadly force, based on her fear of an immediate threat to her own safety,

where there were genuine disputes regarding where she was in relation to the suspect's vehicle when she fired her weapon and how fast the vehicle was accelerating); *Acosta v. City and County of San Francisco,* 83 F.3d 1143, 1146–47 (9th Cir.1996) (holding that a reasonable jury could find that an officer used excessive force, where there were genuine disputes regarding where an officer was standing relative to the suspect's vehicle, the speed of the vehicle, and whether the vehicle was moving in his direction at the time that shots were fired); *Fraire v. City of Arlington,* 957 F.2d 1268, 1274–76 (5th Cir.1992) (finding that a reasonable officer could fear an immediate threat of serious physical harm to himself, where a suspect drove his truck straight toward the officer after a high-speed police pursuit).

787–88 (4th Cir.1998) (stating that contrary witness statements were not sufficient to question an officer's testimony that he believed the suspect had a knife, where the officer had a closer vantage point and special knowledge of the suspect's dangerousness and past threats).[42]

The speed of Waterman's vehicle, his rate of acceleration during the critical moments, and whether he steered in the officers' direction also are facts that are material to the potential threat posed and the officers' perceptions of Waterman's intentions when he accelerated. As stated above, there are genuine disputes in this case as to all of these facts. Two neutral witnesses and one of the officers have stated that Waterman did not steer his vehicle in the officers' direction, and the videotape evidence supports this conclusion. (*See* Pls.' Opp. Mem. at Ex. 5, Keel Dep., at 44, 83; *id.* at Ex. 15, Tr. 11/28/00 Ross Interview, at 10; *id.* at Ex. 20, Castillo Aff., at ¶ 6; Defs.' Mem. at Ex. 16, Videotape: BWI 6.) The evidence from the defendants' experts suggests that Waterman was coasting at a moderate speed of 11.1 m.p.h. and accelerated only slightly during the critical moments, increasing his speed by less than 4 m.p.h., and the testimony of three of the officers and one neutral witness and the videotape evidence support this finding. (*See* Defs.' Mem. at Ex. 21, Packer Eng'g Rep.; *id.* at Ex. 19, Heisey

Stmt., at 3; *id.* at Ex. 20, Keel Dep., at 44, 47; *id.* at Ex. 23, Bellman Stmt., at 2; Pls.' Opp. Mem. at Ex. 15, Tr. 11/28/00 Ross Interview, at 7.) Taking all of the evidence in the light most favorable to the plaintiffs, a reasonable officer would have perceived that none of the officers were directly in front of Waterman's vehicle at the moment of acceleration, that Waterman didn't steer his vehicle toward any of the officers, that he was moving at a relatively slow speed, and that he accelerated only slightly. Under these circumstances, a reasonable officer would not have probable cause or sound reason to believe that Waterman posed an immediate threat of serious physical harm to the officers.

The question remains whether a reasonable officer would have had probable cause or sound reason to believe that the vehicle posed an immediate threat of serious physical harm to other individuals at the moment that Waterman accelerated. The officers knew that Officers Farrow and Watkowski had been involved in a police pursuit from BWI Airport, lasting for over ten minutes, and that Waterman was refusing to pull over. (*See* Defs.' Mem. at Ex. 19, Heisey Stmt., at 1; *id.* at Ex. 24, Keel Stmt., at 1; *id.* at Ex. 26, Batton Stmt., at 2.) The officers had heard Officer Watkowski's report over the radio: "just tried to run me off the road...he's trying to take us off the road." [43] (*See* Pls.' Opp.

---

**42.** Kathy Lee Ross was in a toll booth in an adjacent lane to Waterman's vehicle, Terri Smith was separated from Waterman's vehicle by two toll lanes and a row of plastic orange cones, Carlos Castillo was in a vehicle in an adjacent lane, and the video camera on Officer Watkowski's vehicle was located directly behind Waterman's vehicle. (Pls.' Opp. Mem. at Ex. 15, Tr. 11/28/00 Ross Interview, at 1; *id.* at Ex. 16, Tr. 12/5/00 Smith Interview, at 1; *id.* at Ex. 20, Castillo Aff., at ¶ 3; Defs.' Mem. at Ex. 21, Packer Eng'g Rep.) These witnesses were located in different but relatively close vantage points compared to the defendant officers, and dispute the key

issue of material fact in this case as to whether Waterman posed an immediate threat to the officers.

**43.** In addition, one officer heard the police signal "10–0" for "use caution." (Defs.' Mem. at Ex. 19, Heisey Stmt., at 3.) The implication to be drawn from the 10–0 code, standing alone, is unclear. The defendants' expert, Samuel Wichner, testified that a 10–0 warning was warranted as soon as Waterman refused to pull over. (Pls.' Opp. Mem. at Ex. 24, Wichner Dep., at 104.) Taking the evidence in the light most favorable to the plaintiffs, the court concludes that the 10–0 warning by itself did not add any facts that would

Mem. at Ex. 18, Batton Dep., at 27–28; *id.* at Ex. 19, Heisey Stmt., at 3; *id.* at Ex. 20, Keel Dep., at 23.) On the other hand, the officers had no evidence or reason to believe that Waterman had posed a threat to other motorists or individuals, or otherwise driven recklessly, during an eighteen-mile police pursuit.

A reasonable officer would have relied on not only the information reported by Officer Watkowski, but also his own personal observations as Waterman's vehicle emerged from the tunnel and proceeded to the toll plaza. *See Gooden,* 954 F.2d at 965 ("What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced."). Where there are discrepancies between the reports from others and the officers' personal observations at the scene, "a police officer may not close his or her eyes to facts that would clarify the circumstances." *Taylor v. Farmer,* 13 F.3d 117, 121 (4th Cir.1993) (quoting *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986)). Although an officer may be entitled to qualified immunity even though his perceptions at the scene later prove to be mistaken, this does not mean that an officer can simply rely on the reports of others in all circumstances. *Compare Gooden,* 954 F.2d at 965–66 (granting qualified immunity where the officers relied on a witness report that was verified by their personal observations), *with Bailey v. Kennedy,* 349 F.3d 731, 740–41 (4th Cir.2003) (denying qualified immunity where the officers relied on a witness report on a 911 call that was not supported by any evidence or personal ob-

servations at the scene), *and Taylor,* 13 F.3d at 120–21 (denying qualified immunity where the officers relied on a witness report that was contradicted by their personal observations, and distinguishing *Gooden* based on "the amount of care exercised by the investigating officers" in that case and their personal investigation and corroboration of the witness report). In this case, the officers' personal observations should have raised doubts about the threat posed by Waterman to others as he approached the toll plaza, even though the officers also were entitled to rely on Officer Watkowski's report that Waterman had tried to run him off the road.

Although the exigent circumstances in this case precluded any independent investigation of Officer Watkowski's radio report, the officers had up to 27 seconds personally to observe Waterman's vehicle when it emerged from the Fort McHenry Tunnel.[44] A reasonable officer would have observed that Waterman was driving at a normal speed, proceeding in a direct line to the toll plaza, slowing down a safe distance from the vehicles in front of him, and accelerating in tandem with the traffic in his lane. (Defs.' Mem. at Ex. 16, Videotape: BWI 6.) The officers did not see Waterman swerve or make any sudden or threatening movements within the vehicle. (*Id.*) There were no signs of any damage to Waterman's vehicle or to the two police vehicles that had been pursuing him. (*Id.*) Although all of the officers were yelling at Waterman to stop, he appeared non-responsive. (*Id.* at Ex. 20, Keel Dep., at 42, 46–47.) The officers saw Waterman's hands on the steering wheel of his vehicle, and one officer saw Waterman raise his hands

---

establish probable cause or sound reason to believe that Waterman posed a threat of serious physical harm.

**44.** Both videotapes show that 27 seconds elapsed between the moment that Waterman's

vehicle emerged from the Tunnel, and the moment that he accelerated in the general direction of the officers and the toll plaza ahead. (Defs.' Mem. at Ex. 12, Videotape: BWI 9; *id.* at Ex. 16, Videotape: BWI 6.)

as if to surrender. (*Id.* at Ex. 17, Hames Dep., at 61; *id.* at Ex. 20, Keel Dep., at 43; *id.* at Ex. 18, Batton Dep., at 29, 32, 67.) They noted that Waterman looked "zapped out" or "crazed" or "like he didn't care," or was "kind of smiling." [45] (*Id.* at Ex. 20, Keel Dep., at 42–43; Pls.' Opp. Mem. at Ex. 7, Heisey Dep., at 46.) Taking the evidence in the light most favorable to the plaintiffs, there were no officers or other individuals directly in front of Waterman's vehicle at the time that he accelerated, Waterman did not appear to steer his vehicle towards any individuals or other vehicles or attempt to strike them, he was moving at a relatively low speed of 11.1 m.p.h. and accelerated by only 4 m.p.h., the only vehicles in his vicinity were stopped or moving at low speeds as well, and his movements and facial expressions did not clearly suggest any present intent to harm others.

In light of all of these facts, a reasonable officer would not have believed that Waterman posed an immediate threat of serious physical harm to other individuals at the moment of acceleration.[46] The officers no doubt wished to prevent Waterman from fleeing the scene and to end the pursuit there. However, the Supreme Court made clear in *Garner* that the use of deadly force to prevent the escape of all suspects—even all felony suspects—is "constitutionally unreasonable." 471 U.S. at 11, 105 S.Ct. 1694. Deadly force is not authorized unless the officers have probable cause or sound reason to believe that the suspect poses an immediate threat of serious physical harm. *See id.; see also Gray–Hopkins*, 309 F.3d at 231. The officers' speculation about all of the potential

---

**45.** The evidence regarding Waterman's hand movements and facial expressions is subject to any number of interpretations regarding his intentions. Taking the conflicting evidence in the light most favorable to the plaintiffs, Waterman *either appeared willing to surrender or at least not intent on causing harm.*

**46.** Decisions from other courts of appeals involving the use of deadly force against a suspect in a moving vehicle have rested on more evidence than this before concluding that a reasonable officer could believe that the suspect posed a threat of serious physical harm to others. *Compare Dudley v. Eden*, 260 F.3d 722, 724, 727 (6th Cir.2001) (stating that it was reasonable for an officer to believe that a fleeing bank robbery suspect posed a threat of serious physical harm to others, where the officer had observed the suspect speed away while surrounded by officers, swerve into traffic, and strike a police vehicle, he was not sure if the suspect had fired shots, and the suspect was in traffic), *Scott v. Clay County, Tenn.*, 205 F.3d 867, 871–72, 877 (6th Cir. 2000) (stating that a fleeing suspect posed a threat of serious physical harm to other motorists, where the suspect had engaged in a high-speed police pursuit at up to 100 m.p.h., nearly struck a police vehicle and a police officer, and forced a motorist off the road, and the suspect was driving back into traffic), *and Cole v. Bone*, 993 F.2d 1328, 1330–31, 1333–34 (8th Cir.1993) (finding that an officer had probable cause to believe that a fleeing suspect posed a threat of serious physical harm to other motorists, where the suspect had engaged in a high-speed police pursuit for over 50 miles, attempted to strike several police vehicles, and forced other motorists off the road, and was moving at high speeds in traffic), *with Vaughan v. Cox*, 343 F.3d 1323, 1326–27, 1330–31 (11th Cir.2003) (stating that a reasonable jury could conclude that a suspect in a moving vehicle did not pose a threat of serious physical harm to others, where the suspect had evaded arrest in a brief police chase at speeds of up to 85 m.p.h. and had struck the back of a police vehicle, but had not threatened any other vehicles and was not currently in the vicinity of other vehicles), *and Abraham*, 183 F.3d at 292–93 (holding that an officer was not entitled to qualified immunity for her use of force against a fleeing suspect based on the threat to others, where the suspect was believed to be intoxicated and had bumped into a parked car, but there were factual disputes as to how close the suspect had come to striking other individuals and at what speed he was accelerating, and the suspect was in a parking lot).

threats that any suspect might pose—that he might be armed, might attempt to hijack a bystander, or might attempt to strike other vehicles or individuals—is not sufficient to constitute probable cause or sound reason. Without further evidence that Waterman had posed or continued to pose a threat of serious physical harm to other motorists, a reasonable officer would not have believed that deadly force was warranted at that moment.

The plaintiffs also point to the evidence that some of the shots were fired from behind, after all of the officers were undisputedly out of the vehicle's path, and argue that no reasonable officer could have perceived a threat of serious physical harm at that time. (Pls.' Opp. Mem. at 33.) The defendants note that the Fourth Circuit has cautioned against creating "artificial divisions in the sequence of events" when evaluating a claim of excessive force, stating that the objective reasonableness of a particular use of force must be evaluated in the full context of all relevant facts and circumstances. *Rowland,* 41 F.3d at 173. In another case involving a fleeing suspect in a moving vehicle, *Pittman v. Nelms,* 87 F.3d 116, 120 (4th Cir.1996), the Fourth Circuit affirmed qualified immunity for an officer who allegedly fired at the vehicle while it was speeding away, immediately after he was caught in the car, dragged for 25 to 30 feet, and then released relatively unharmed. In response to the plaintiff's argument that the shots were fired while the vehicle was driving away and presented no present threat, the court noted that "the entire series of events took only a few short seconds, and that during that period

[the officer] was in serious danger." *Id.* In this case, the gap between the moment of Waterman's acceleration and the final round of shots appears to be approximately six seconds, a similarly short period of time. Although the *Rowland* and *Pittman* decisions thus preclude the court from finding a constitutional violation on the basis of the final round of shots standing alone, these facts nonetheless form part of the "full context" in this case, *Rowland,* 41 F.3d at 173, and lend support to the plaintiffs' claim that Josh Waterman's constitutional rights were violated.

Finally, to support the claim that Waterman presented an immediate threat of serious physical harm, the defendants suggest that Waterman was armed with a deadly weapon, in this case his vehicle.[47] Unlike a firearm or similar weapon, which is inherently deadly and dangerous, a vehicle is a deadly or dangerous weapon only if it is used in a particular manner. *See United States v. Arrington,* 309 F.3d 40, 45 (D.C.Cir.2002) (stating that in order to prove use of a deadly or dangerous weapon under a federal statute for an object that is not inherently deadly, such as a vehicle, "the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner") (emphasis in original); *cf. United States v. Murphy,* 35 F.3d 143, 147 (4th Cir.1994) ("Assessing whether an object constitutes a dangerous weapon hinges not on the object's latent capability alone, but also on the manner in which the object is used.") (internal quotations omitted).[48] Merely displaying or reaching for

---

**47.** The officers had no reason to believe that Waterman was armed with any other weapon. (*See* Defs.' Mem. at Ex. 18, Batton Dep., at 27.) Although Officer Watkowski reported over the police radio that Waterman had reached under his seat (*id.* at Ex. 11, Tr. 11/28/00 Chs. 1 & 6, at 3), the defendants have not presented any evidence that any of

the three defendant officers heard or were aware of this statement.

**48.** In *Arrington* the court also noted that the use of a vehicle for flight from law enforcement would not be sufficient to constitute use as a dangerous or deadly weapon. *See* 309 F.3d at 45.

an inherently deadly or dangerous weapon may be sufficient to give a reasonable officer probable cause or sound reason to fear an immediate threat of serious physical harm.[49] In the case of a vehicle, however, the threat depends on the use to which the vehicle is being put at that moment. In other cases in which the courts have found sufficient evidence to conclude that a defendant used a vehicle as a deadly or dangerous weapon, the driver had attempted to strike individuals, *see United States v. Woody*, 55 F.3d 1257, 1274–75 (7th Cir. 1995) (driver accelerated toward two postal inspectors, striking one and nearly missing the other); *cf. Arrington*, 309 F.3d at 42–43, 49 (driver accelerated while three officers were partially inside of his vehicle, dragging one officer for 50 feet), or had attempted to strike other vehicles several times in a row, *see United States v. Garcia*, 868 F.2d 114, 116 (4th Cir.1989) (driver swerved at police vehicles in adjacent lane three times in a row, forcing officers to swerve into lanes of oncoming traffic). For example, the defendants cite *Pace v. Capobianco*, 283 F.3d 1275, 1276–78, 1282 (11th Cir.2002), in which the court stated that an officer had probable cause to believe that the defendant was using his vehicle as a deadly weapon, after he had swerved at several police vehicles, driven

through a front yard at 50 to 60 m.p.h., nearly hit a motorist head-on, and accelerated towards a police vehicle at an attempted roadblock. Thus, whether a reasonable officer would have had probable cause or sound reason to believe that Waterman's vehicle constituted a deadly or dangerous weapon at the moment of acceleration turns on the same facts noted above, and does not add anything new to the court's analysis.

## B. Clearly Established Right

■ Although the plaintiffs have proffered evidence of a violation of a constitutional right, the defendant officers nonetheless are entitled to qualified immunity if that right was not clearly established at the time of the incident. For a constitutional right to be clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jones*, 325 F.3d at 531 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)) (internal quotation omitted). The test again is one of objective reasonableness. *See id.* An officer is not entitled to qualified immunity if the state of the law at the time of the incident gave the officer "fair warning" that his conduct was unconstitutional. *See Jones*,

---

**49.** This factual difference also sets this case apart from all recent published cases in which the Fourth Circuit has held that officers who used deadly force were entitled to qualified immunity, because those officers reasonably believed that they were confronted with an inherently deadly or dangerous weapon, typically a firearm. *See Cox v. County of Prince William*, 249 F.3d 295 (4th Cir.2001) (decedent pointed a rifle at officers); *Anderson*, 247 F.3d 125 (decedent reached for a bulge, which officer suspected was a gun); *Milstead v. Kibler*, 243 F.3d 157 (4th Cir.2001) (officer believed that decedent was holding a gun, based on 911 calls and shots fired at the scene); *Sigman*, 161 F.3d 782 (officers believed that decedent was holding a knife, which he had already used against others at

the scene); *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir.1996) (decedent pointed a gun at officers); *Lowery v. Stovall*, 92 F.3d 219 (4th Cir.1996) (decedent attacked one officer with a sharp object, believed to be a knife, and then threatened another officer with the object); *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir.1994) (officer mistook decedent for an armed suspect and couldn't see his hands); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir.1991) (decedent was holding an object in his hands that the officer suspected was a gun, and decedent ignored officer's orders to raise his hands). By contrast, the Fourth Circuit has denied qualified immunity in cases in which an officer used deadly force against an unarmed suspect. *See Clem*, 284 F.3d at 551–52; *Rowland*, 41 F.3d at 174.

325 F.3d at 531. The officer's conduct must be evaluated "on the basis of information actually possessed by the officer at the critical time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." *Pritchett v. Alford,* 973 F.2d 307, 312–13 (4th Cir.1992) (internal citations omitted). As the Fourth Circuit has noted, "[t]he concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances." *Rowland,* 41 F.3d at 172.

By November 2000, it had been clearly established for over ten years that the use of deadly force against a suspect constitutes a seizure, and would be analyzed under the objective reasonableness standard of the Fourth Amendment, based on the factors outlined in *Graham. See Graham,* 490 U.S. at 395–96, 109 S.Ct. 1865; *Garner,* 471 U.S. at 7, 105 S.Ct. 1694. This includes "whether the suspect poses an immediate threat to the safety of the officer or others." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Further, the Supreme Court had clearly established that the use of deadly force to stop a fleeing suspect is objectively reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner,* 471 U.S. at 11, 105 S.Ct. 1694; *see also Drewitt,* 999 F.2d at 777. It was clearly established law that the use of deadly force constitutes an "unmatched" intrusion on a suspect's Fourth Amendment rights, *Garner,* 471 U.S. at 9, 105 S.Ct. 1694, and thus would require a higher level of present threat than other police uses of force. A reasonable officer in the defendants' position would have known, for example, that deadly force cannot be used in all cases to stop a fleeing suspect. *Id.* at 11, 105 S.Ct. 1694.

In addition to these general outlines, a reasonable officer would have known the kinds of factual circumstances in which a moving vehicle would be found to pose an immediate threat of serious physical injury, thus justifying the use of deadly force. Prior cases "involving 'fundamentally similar' or 'materially similar' facts 'can provide especially strong support for a conclusion that the law is clearly established.'" *Jones,* 325 F.3d at 531 (quoting *Hope,* 536 U.S. at 741, 122 S.Ct. 2508). In the *Drewitt* decision in 1993, the Fourth Circuit made clear that while a suspect fleeing in a vehicle may constitute a threat of serious physical harm to an officer standing in front of the vehicle, the question turns on the location of the officer in relation to the vehicle. *See Drewitt,* 999 F.2d at 778, 780. Decisions from other circuits also had noted the importance of where an officer is standing relative to a moving vehicle, as well as the vehicle's speed and direction, in determining whether that vehicle poses an immediate threat of serious physical harm to the officer. *See Abraham,* 183 F.3d at 293–94; *Acosta,* 83 F.3d at 1146–47; *Fraire,* 957 F.2d at 1274–76. A reasonable officer also would have had "fair warning" that the objective reasonableness of the force employed must be evaluated based not only on Officer Watkowski's radio reports, but also on their own personal observations and investigation of the facts. *See Gooden,* 954 F.2d at 965; *Taylor,* 13 F.3d at 121.

The contours of Josh Waterman's constitutional rights were sufficiently clear that a reasonable officer would have had fair warning in November 2000 that the use of deadly force in this case, under the totality of the circumstances as presented by the plaintiffs, would violate Waterman's constitutional rights. The defendant officers thus are not entitled to qualified immunity on the plaintiffs' Section 1983 claim.

## III. State Law Claims

The plaintiffs also have asserted a number of state law claims for violations of the Maryland Declaration of Rights, battery and gross negligence, and wrongful death. In their motion for summary judgment, the defendants raise the following arguments, which will be considered in turn: (1) the state constitutional claims parallel the federal constitutional claims, and thus must fail with them, (2) the individual officers are entitled to statutory immunity under the Maryland Tort Claims Act ("MTCA"), (3) the individual officers are entitled to common law public official immunity, (4) the individual officers owed no tort duty to Waterman, and thus neither the officers nor the state of Maryland can be liable on the negligence claims, and (5) the contributory negligence of Waterman and the plaintiffs bar recovery on the negligence claims.

### A. Articles 24 and 26 of the Maryland Declaration of Rights

In addition to their federal constitutional claims under the Fourth Amendment, the plaintiffs also allege that the use of deadly force against Josh Waterman violated his rights under Articles 24 and 26 of the Maryland Declaration of Rights. On the merits, the analysis applied to this claim is the same as the analysis applied to an excessive force claim under the Fourth Amendment. *See Peacock v. Mayor & City Council of Balti-*

*more,* 199 F.Supp.2d 306, 310 n. 4 (D.Md. 2002) (noting that the plaintiff's claims under Articles 24 and 26 require the same analysis as his claims under the Fourth and Fourteenth Amendments); *Richardson v. McGriff,* 361 Md. 437, 762 A.2d 48, 56 (2000) (stating that the principles applied to excessive force claims under the Fourth Amendment are the appropriate principles to apply to similar claims under Article 26). For the reasons stated above, there are genuine issues of material fact as to whether the defendants violated Josh Waterman's rights under the Maryland Declaration of Rights. Moreover, Maryland state officers are not entitled to common law qualified immunity for constitutional torts. *See Okwa v. Harper,* 360 Md. 161, 757 A.2d 118, 140 (2000).[50] The defendants thus are not entitled to summary judgment on the plaintiffs' claims under the Maryland Declaration of Rights.

### B. Statutory Immunity Under the MTCA

The defendants argue that the individual officers are entitled to judgment on counts three, four, and six, because they are immune from liability under the MTCA. The MTCA immunizes individual state employees from tort liability "for a tortious act or omission that is within the scope of [their] public duties . . . and is made without malice or gross negligence, and for which the State or its units have waived immunity under [the MTCA]." Md.Code Ann., Cts. & Jud. Proc. § 5–522(b).[51] The parties agree

**50.** However, state officers still may qualify for statutory immunity under the MTCA for constitutional violations. *See Lee v. Cline,* 149 Md.App. 38, 814 A.2d 86, 102 (2002), *cert. granted* 374 Md. 82, 821 A.2d 370 (2003); *but see Tavakoli–Nouri v. State,* 139 Md.App. 716, 779 A.2d 992, 1002–03 (2001)(explaining that state officials are not entitled to immunity under the MTCA for constitutional violations). Because the defendant officers are not entitled to summary judgment on the basis of their claim to statutory immunity under the MTCA, *see infra,* at this time the court need not reach the question of whether this statuto-

ry immunity extends to constitutional claims under Maryland law.

**51.** The MTCA waives the sovereign immunity of the state and its units as to a tort action brought in a court of the state. *See* Md.Code Ann., State Gov't § 12–104. The state may be held liable under the MTCA for a tortious act or omission by a state employee if the act or omission is within the scope of the public duties of that state employee, and is made without malice or gross negligence. *See* Md. Code Ann., Cts. & Jud. Proc. § 5–522(a)(4).

that Officers Batton, Heisey, and Keel were acting within the scope of their employment as MdTA officers during the events in question (Am. Compl. at ¶ 6–8; Am. Answer at ¶ 6–8), so the officers are entitled to statutory immunity under the MTCA unless they acted with malice or gross negligence.

■■ The Maryland courts have noted that the existence of malice generally should not be disposed of on summary judgment, but should be an issue for the fact-finder. *See, e.g., Thacker v. City of Hyattsville,* 135 Md.App. 268, 762 A.2d 172, 189 (2000). However, to survive a motion for summary judgment asserting immunity under the MTCA, "the plaintiff must point to specific evidence that raises an inference that the defendant's actions were improperly motivated." *Id.* at 189–90. To overcome statutory immunity under the MTCA based on a state employee's malice, the plaintiff must show that the employee acted with "actual malice." *See Shoemaker v. Smith,* 353 Md. 143, 725 A.2d 549, 560 (1999). This requires showing that the employee "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Thacker,* 762 A.2d at 189 (quoting *Shoemaker,* 725 A.2d at 560); *see also Shoemaker,* 725 A.2d at 560 (stating that malice requires showing that the defendant's conduct "was motivated by ill will, by an improper motive, or by an affirmative intent to injure [the plaintiff]"). Malice can be inferred from the surrounding circumstances, and may be found even if a state employee's actions were objectively reasonable. *See Lee v. Cline,* 149 Md.App. 38, 814 A.2d 86, 114 (2002).

■ The plaintiffs in this case have pointed to specific evidence that raises an inference the defendant officers acted with malice. Taking the facts in the light most favorable to the plaintiffs, the defendant officers intended to injure (and even kill) Waterman,[52] used deadly force after Waterman's repeated failures to obey various officers' commands and his alleged assault of one of their fellow officers, shot him multiple times at close range, continued to shoot him after all of the officers had moved out of the way of the vehicle, and acted without legal justification or excuse. In a case involving a similar factual scenario, a police officer fired several shots at the tires on the plaintiff's car, after observing the plaintiff driving in what appeared to be a reckless manner. The Maryland Court of Special Appeals held that a reasonable jury could infer actual malice, based on a finding that the officer "became enraged at what appeared to him to be grossly reckless conduct by [the plaintiff,] endangering others on the highway, and that he fired at [the plaintiff] or [the plaintiff's] vehicle with the intention of injuring [him]." *Town of Port Deposit v. Petetit,* 113 Md.App. 401, 688 A.2d 54, 63 (1997); *see also Okwa,* 757 A.2d at 129 (finding that a reasonable jury could infer malice from the fact that the officers used force after the plaintiff failed to obey their instructions immediately). Although a reasonable jury could find that the officers subjectively believed that their actions were legally justified, a reasonable jury also could infer that the officers intended to injure Waterman without legal justification or excuse, and out of anger at Waterman's apparently reckless conduct and failure to obey their instructions. These factual conclusions would support a finding of malice, and thus the defendant officers

---

**52.** Keel testified that he was attempting to strike the driver (Pls.' Opp. Mem. at Ex. 5, Keel Dep., at 54), and Batton testified that he was attempting to shoot the driver to kill him (*id.* at Ex. 6, Batton Dep., at 34).

are not entitled to statutory immunity under the MTCA at the summary judgment stage.[53]

If this case proceeds to trial, the jury will determine whether the defendants acted with malice or gross negligence, and this in turn will determine which of the plaintiffs' claims may survive. The plaintiffs' claims under counts three through seven are, in certain respects, mutually exclusive. As noted, in order to hold the state liable under the MTCA for a tortious act or omission by a state employee, the act or omission must be made without malice or gross negligence. *See* Md.Code Ann., Cts. & Jud. Proc. § 5–522(a)(4). If the state can be held liable under the MTCA for a state employee's tortious act or omission, then that individual employee is immune from tort liability. *See id.* § 5–522(b). Thus, if the jury determines that the defendant officers did not act with malice or gross negligence, then the individual officers will be entitled to statutory immunity under the MTCA, and counts three, four, and six will fail, but counts five and seven will remain. On the other hand, if the jury determines that the individual officers are not entitled to statutory immunity because they acted with malice or gross negligence, then the state will not be liable under counts five and seven, but counts three, four, and six will remain.

## C. Public Official Immunity

■ The defendants also argue that the individual officers are entitled to judgment on counts four and six, the gross negligence and wrongful death claims, because they are entitled to common law public official immunity.[54] Under Maryland law, a state official is entitled to common law public official immunity if (1) the individual is a public official; (2) the conduct at issue occurred while the official was performing discretionary acts; (3) the relevant acts were performed within the scope of the individual's official duties; and (4) the individual did not act with malice. *See Baltimore Police Dep't v. Cherkes*, 140 Md.App. 282, 780 A.2d 410, 437 (2001). As is true with statutory immunity under the MTCA, for public official immunity "[o]rdinarily, the presence or absence of malice is a fact to be determined at trial." *Id.* at 438 (quoting *City of District Heights v. Denny*, 123 Md.App. 508, 719 A.2d 998, 1006 (1998)). A state official is entitled to dismissal of a claim on the basis of public official immunity only "[i]f the facts alleged are not sufficient to permit a finding of malice." *Id.* As stated above, the facts in this case are sufficient for a reasonable jury to find that the individual defendants acted with malice, and the officers thus are not entitled to judgment on this basis.

## D. Duty Analysis for Tort Claims

The defendants argue that they are entitled to judgment on the state law tort claims under counts four through seven, because the individual officers owed no duty of care to Josh Waterman. The exis-

---

**53.** If the plaintiffs had not produced sufficient evidence for a reasonable jury to find that the individual defendants acted with malice, then the officers would be entitled to public official immunity, *see infra,* and the issue of statutory immunity under the MTCA would become moot as to counts four and six, and possibly as to count one, *see supra,* note 50. For this reason, and because the plaintiffs have produced sufficient evidence that the officers acted with malice, the court does not need to reach the question of whether the plaintiffs

have pointed to specific evidence that the defendant officers' actions amounted to gross negligence, thus barring statutory immunity on that basis.

**54.** As the defendants concede, under Maryland law public official immunity does not apply to constitutional or intentional torts, and thus this argument does not apply to counts one or three. *See Okwa,* 757 A.2d at 140; *Ashton v. Brown,* 339 Md. 70, 660 A.2d 447, 470–71 (1995).

tence of a duty of care owed by the defendant to the plaintiff is a threshold requirement for a tort claim, and is an issue of law for the court to determine. *See Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 642 A.2d 180, 188–89 (1994). As support for their argument that the individual officers owed no duty of care to Waterman, the defendants cite a case in which the Maryland Court of Appeals held "that absent a 'special relationship' between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers." *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078, 1083 (1986) (applying the special relationship doctrine to the duty owed by a police officer to a pedestrian injured by a drunk driver). The defendants also cite several cases in which the Maryland courts have held that other public officials do not owe a duty of care to protect members of the general public from third parties or external harms, absent a special relationship. *See Muthukumarana v. Montgomery County,* 370 Md. 447, 805 A.2d 372, 395 (2002) (applying the special relationship doctrine to the duty owed by a 911 employee to an individual in need of emergency services, who is injured by a third party); *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297, 1300–02 (1985) (applying the special relationship doctrine to the duty owed by a probation officer to an individual injured by a probationer); *Fried v. Archer,* 139 Md.App. 229, 775 A.2d 430, 446 (2001) (applying the special relationship doctrine to the duty owed by a police dispatcher to a victim calling in for assistance, who is injured by a third party); *Willow Tree Learning Center, Inc. v. Prince George's County, Md.,* 85 Md.App.

508, 584 A.2d 157, 162 (1991) (applying the special relationship doctrine to the duty owed by a county inspector to a child injured on playground equipment that is not in compliance with county safety standards).

 None of the cases cited by the defendants are apposite to the facts presented in this case. The authority cited by the defendants would be relevant if, for example, bystanders at the toll plaza had been harmed by Josh Waterman, and then sued the MdTA officers for failure to protect them from harm. In this case, however, the plaintiffs are not claiming that the police officers failed to protect Josh Waterman from a third party. The defendant officers themselves applied force to Waterman, and thus owed him a duty to act with ordinary care in their application of force. *Cf. Richardson,* 762 A.2d at 56 (examining a gross negligence claim against a police officer based on a claim of excessive force). For the reasons stated above, there are genuine issues of material fact as to whether the defendants' conduct constituted gross negligence against Josh Waterman, and the defendants thus are not entitled to summary judgment on these claims.

### E. Contributory Negligence for Tort Claims

 Finally, the defendants argue that they are entitled to judgment on the state law tort claims under counts four through seven, because Josh Waterman, Michael Waterman, and Roland and Ruth Waterman were contributorily negligent in Josh Waterman's death.[55] Maryland continues to follow the common law rule that

---

55. The decedent's contributory negligence can be raised as a defense in a wrongful death or survivor action under Maryland law. *See Smith v. Gross,* 319 Md. 138, 571 A.2d 1219, 1221–22 (1990). In addition, in a wrongful death action the defendant may raise any defenses that are applicable to the plaintiffs, even if they could not have been raised against the decedent. *See Eagan v. Calhoun,* 347 Md. 72, 698 A.2d 1097, 1102 (1997).

the plaintiff's contributory negligence bars all recovery. *See Prudential Securities, Inc. v. E–Net, Inc.,* 140 Md.App. 194, 780 A.2d 359, 377 (2001); *see also Harrison v. Montgomery County Bd. of Educ.,* 295 Md. 442, 456 A.2d 894 (1983) (recognizing the common law rule of contributory negligence and declining to judicially abrogate it). A plaintiff is contributorily negligent if he fails to take reasonable and ordinary care for his own safety under the circumstances, and this failure to take care contributes to his injury. *See Kassama v. Magat,* 136 Md.App. 637, 767 A.2d 348, 359 (2001); *Faith v. Keefer,* 127 Md.App. 706, 736 A.2d 422, 444 (1999). The defendant has the burden of proving contributory negligence. *See Moodie v. Santoni,* 292 Md. 582, 441 A.2d 323, 325 (1982); *Faith,* 736 A.2d at 443. Further, the defendant must demonstrate that the plaintiff "acted or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves." *State v. Thurston,* 128 Md.App. 656, 739 A.2d 940, 945 (1999). Whether the plaintiff was contributorily negligent generally is reserved for the jury: "It is only where the minds of reasonable persons cannot differ that the court is justified in deciding the question as a matter of law." *Moodie,* 441 A.2d at 327; *see also Menish v. Polinger Co.,* 277 Md. 553, 356 A.2d 233, 238 (1976) (noting that in order for the court to find contributory negligence as a matter of law "the act (or omission) so relied on must be distinct, prominent and decisive, and one about which reasonable minds would not differ in declaring it to be negligence").

As evidence of Waterman's contributory negligence, the defendants point to his failure to take his prescribed medication, violations of a number of Maryland state laws during the police pursuit,[56] failure to yield to the officers throughout the encounter, and acceleration of his vehicle in the general direction of the officers at the toll plaza. (Defs.' Mem. at 44–45.) The defendants have not provided any evidence that Josh Waterman knew and appreciated the danger of injury to himself, *see Thurston,* 739 A.2d at 945, nor have they addressed how his current mental state would affect such a finding. As evidence of the plaintiffs' own contributory negligence, the defendants assert that members of Waterman's family "did not appropriately deal" with his impending mental health problems because they waited to take him to the doctor. (Defs.' Mem. at 45–46.) The defendants have not cited any controlling legal authority regarding the scope of the duty owed by the plaintiffs in supervising a mentally ill adult family member, or establishing that the responses by the family members in this case fell below the standard of reasonable and ordinary care for his safety under the circumstances.[57] Further, the defendants have

---

**56.** Under Maryland law, an individual's violation of a statute is evidence of negligence but does not constitute negligence per se, even if the violation causes or contributes to the individual's injuries. *See Absolon v. Dollahite,* 376 Md. 547, 831 A.2d 6 (2003) (holding that a pedestrian's breach of traffic safety rules did not constitute per se contributory negligence, but was evidence for the jury to consider, in an action for injuries caused when the pedestrian was struck by a vehicle).

**57.** The undisputed evidence establishes that in the days leading up to Josh Waterman's

death the plaintiffs monitored his condition and made plans to seek medical treatment once it became apparent that this was appropriate. Josh Waterman volunteered that he had stopped taking his medication, the family made plans to take him to a doctor at the next reasonable opportunity, and he indicated that he would go to the doctor willingly. (*See* Pls.' Opp. Mem. at Ex. 2, Walters Dep., at 8–10, 25–27; Defs.' Mem. at Ex. 5, Walters Dep., at 13.) The family had no reason to believe that his current mental state was as bad as subsequent developments suggest.

made no attempt to establish that either Josh Waterman's or the plaintiffs' alleged negligence proximately caused Waterman's injuries. On both of these claims, the defendants have failed to carry their burden on a motion for summary judgment of establishing that "the minds of reasonable persons could not differ" that the actions of Josh Waterman and the plaintiffs amounted to contributory negligence. *See Moodie*, 441 A.2d at 327.

## IV.

The defendants have failed to demonstrate that there are no genuine issues of material fact in this case and that they are entitled to judgment as a matter of law. The plaintiffs have proffered sufficient evidence to establish a violation of Josh Waterman's Fourth Amendment rights, and the defendant officers are not entitled to qualified immunity because these rights were clearly established at the time of the incident. The defendants likewise are not entitled to summary judgment on the plaintiffs' claims under the Maryland Declaration of Rights, because there are genuine issues as to material facts. The defendant officers are not entitled to statutory immunity under the MTCA at the summary judgment stage, because the plaintiffs have pointed to specific evidence that raises an inference that the defendants acted with malice. The officers also are not entitled to common law public official immunity at the summary judgment stage, because the facts in this case are sufficient for a reasonable jury to find that the defendant officers acted with malice. Finally, the defendants are not entitled to judgment on the state law tort claims, because they have failed to establish that the defendant officers owed no duty of care to Josh Waterman, or that the minds of reasonable persons could not differ as to whether Josh Waterman and the plaintiffs were contributorily negligent in this mat-

ter. Accordingly, the defendants' motion for summary judgment will be denied.

A separate order follows.

## *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. defendants' motion for summary judgment (Docket No. 28) is **DENIED**;

2. defendants' motion in limine to preclude the testimony of Charles J. Key, Sr. (Docket No. 35) is **DENIED WITHOUT PREJUDICE**; and

3. copies of this Order and the accompanying Memorandum shall be sent to counsel of record.